**STATE of Missouri, Respondent,**

v.

**Marcus TERRY, Appellant.**

**Marcus TERRY, Movant–Appellant,**

v.

**STATE of Missouri, Respondent.**

Nos. 65515, 68173.

Missouri Court of Appeals,
Eastern District,
Division Four.

Aug. 13, 1996.

Raymund J. Capelovitch, Asst. Public Defender, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, David R. Truman, Assistant Attorney General, Jefferson City, for respondent.

HOFF, Judge.

Defendant, Marcus Terry, was convicted by a jury of two counts of murder in the first degree, § 565.020.1 RSMo 1986. He was sentenced to two consecutive terms of life imprisonment without possibility of probation or parole. On appeal, defendant claims the trial court erred in: (1) overruling his motion for a mistrial following the State's cross-examination of one of defendant's witnesses; (2) overruling his *Batson* motion to disallow the State's strikes of two venirepersons from the petit jury; (3) overruling his motion for severance of Counts I and II; and (4) admitting evidence of uncharged crimes.[1] We affirm.

Defendant does not challenge the sufficiency of the evidence. The evidence, viewed in the light most favorable to the verdict, is as follows. On the evening of November 2, 1992, defendant, Kaven Sipes, David "Wookey" Williams, Mark Johnson, and Clarence Temple were involved in a dice game. During the game, defendant confronted Sipes about "the dope he had took from Tawana." Defendant then left the area and, approximately five minutes later, a man wearing a black ski mask appeared and fatally shot Sipes. Temple testified that although he could not see defendant's face, he identified defendant "from his body."

Johnny Jackson, a friend of defendant's, finished his shift at a Rally's restaurant and was walking to his girlfriend's home when he was approached by defendant. Defendant was wearing a black ski mask. Defendant removed the mask and said, "I got that mother fucker."

Four days later, defendant and Temple talked about the shooting. Defendant asked Temple if he knew Williams. Temple said he did not and defendant said he "was going to have to get" Williams because Williams had identified defendant to the police. Defendant asked Temple to "take care of" Williams and gave him $1,000. Two days later, Temple returned the money to defendant and told him he could not do it.

Hyshol "Highshoe" Eastling testified that on November 8, 1992, he, defendant, and Williams were driving around and drinking from the late afternoon until the early morning of November 9, 1992. Ultimately, the three entered Forest Park and Eastling got out of the car to urinate. While he was doing so, defendant shot Williams in the head with a .32 caliber firearm. Eastling got back into the car and defendant told Eastling he would kill him if he said anything. Defendant also said he shot Williams because Williams had been "snitching, talking too much."

Several days later, defendant and Temple were in jail together. Temple asked defendant why he was there. Defendant said "somebody had told the police he had killed the little dude in the park and Kaven Sipes." Defendant speculated Eastling was the informant. When defendant discovered Temple was expected to be released that day, defendant offered him $2,000 to kill Eastling. Defendant also admitted to Temple that he killed Williams.

Defendant did not testify at trial, but presented the testimony of two witnesses in his defense. At the close of all of the evidence, and following the instructions and arguments of counsel, the jury found defendant guilty as charged.

On August 25, 1994, defendant filed a *pro se* motion for postconviction relief pursuant

---

1. Because no claim of error relates to defendant's Rule 29.15 motion, the appeal from the denial of the motion is abandoned. *State v. Page,* 895 S.W.2d 269, 270 (Mo.App.1995).

to Rule 29.15. Appointed counsel filed an amended motion on December 5, 1994. Following an evidentiary hearing, the motion court denied defendant's motion for postconviction relief. This appeal followed.

In his first point on appeal, defendant argues the trial court erred in failing to declare a mistrial following a question asked of Mark Johnson, a witness testifying on defendant's behalf, during the State's cross-examination. During direct examination, Johnson testified defendant was not present at the dice game which preceded Sipes' murder. During cross-examination the following exchange took place:

Q: Okay. Now you say [defendant] was not there?

A: I didn't see him.

Q: But are you saying he wasn't there?

A: I didn't see him. He wasn't there in my eyes.

Q: Could he have been there and you didn't see him?

A: People could have been all around but I didn't see him. He wasn't out there. If he was out there I would have talked to him or whatever.

Q: So if he was there you would have seen him?

A: Yeah, I would have seen him.

Q: So if he said he was there how could you miss him?

A: If he said he was there he was lying, because I was there.

Q: If he said he was there he was lying?

A: Yep.

At this point, defense counsel objected. Out of the hearing of the jury, the following exchange occurred:

[Defense Counsel]: [Prosecutor] has made a reference to a statement made allegedly by the defendant, asking if the defendant said he was there if he was lying. No such statement has ever been disclosed to me.

[Prosecutor]: Come again? You've got the police report. It's in the police report. You know the statement's been disclosed to you.

[Defense Counsel]: And my understanding of the police report is that there is no reference whatsoever to the first homicide.

[Prosecutor]: Excuse me? "He was present when Sipes was murdered." (Showing defense counsel the report)

[Defense Counsel]: Judge, I take this to mean the reference to "he" being David Williams was present when he was murdered. That's how I read this police report.

[Prosecutor]: It specifically says Sipes.

[Defense Counsel]: That he, meaning David Williams, he said it was probably—in reference to the decedent, he was present.

[Prosecutor]: I can see your interpretation. I can have the officer come in.

[Defense Counsel]: My interpretation when they interviewed the defendant they talk about the decedent, the very next word, "he was present," is a reference to the victim, David Williams having been present when Sipes was murdered.

· · ·

The Court: Then I yield with the report since it is not clear from reading the report, then what we'll do is direct the State not to make any further reference.

[Defense Counsel]: Judge, I have to move for a mistrial at this time, because I think the implication clearly now is the defendant has admitted being present. There has been no such evidence offered to me that the State has a statement to that effect. The reliance on the police report, in good faith I believed the reference was directly to David Williams being present at the time of the homicide, and I think now to suggest otherwise denies [defendant] of a fair trial and I move for a mistrial based on the question put to this witness.

The Court: What's your response?

[Prosecutor]: Judge, all along I've read this the defendant was present at that time. I have not inquired as to the police officer. I've relied upon my interpretation as she's relied on hers.

The Court: I haven't read the entire report, so it's hard for me to say. It appears there could be some question, but suffice

to say that I didn't interpret your question as calling for a comment as to whether or not the defendant would be lying or not. Basically, whether or not this witness would have seen him there. But I think he chose to answer. The motion for mistrial is denied.

Defense counsel then read the relevant portion of the police report into the record. The police report states, in part, as follows:

> [Defendant] later learned of the decedent's [Williams'] demise in the evening on Monday, 11–8–92, from an acquaintance (Barry, black male, no further).

> He stated it was probably Kevin [sic] Sipes' people who murdered the decedent. *He was present when Sipes was murdered* and the word on the street "had it that" Sipes' people were going to kill all persons who were present when Sipes was murdered.

(emphasis added). Following the defense counsel's reading of the police report, the trial judge stated, "Begins to sound more like the defendant stated he was there at the crime scene. But if there's any question to it I'm going to—I will direct the State not to inquire further. Motion is denied, though."

On January 28, 1994 the trial court held a hearing on defendant's motion for new trial. During the hearing, Detective Gary Stidum, the author of the police report, presented testimony as to the correct interpretation of the word "he" as used in the police report. During the hearing, the following exchange took place between Detective Stidum and defense counsel:

Q: During the course of that interview did [defendant] ever tell you that he was present at the time of a shooting of a Kaven Sipes, on Gibson[?]

A: Yes, he did.

Q: He indicated to you he was, in fact, present?

A: Yes, he did—

Q: When did he tell you that?

A: —no, he didn't tell me that.

[Prosecutor]: Your Honor, may the record reflect there was an approximately forty-five second interval there while the detective reviewed the pertinent part of that police report?

The Court: So reflect.

Detective Stidum, after reviewing the police report, then testified defendant had been referring to Williams' presence at the dice game. During the State's cross-examination, the prosecutor questioned Detective Stidum further about the police report's ambiguity:

Q: Detective, you reviewed Page 8 of that paragraph [sic] that [defense counsel] just read to you. You took some time to review it. You read it through maybe once, twice, three, four times?

A: Yes.

Q: And were you confused as to what you had written, oh, a year or two years ago, as a matter of fact, I think it was, with reference to the identity of who was present?

A: Yeah. This is somewhat confusing.

Q: So you thought until you recalled what you personally had experienced, when you read that paragraph at one point, you thought it did refer to the defendant ... being present; isn't that correct?

A: Yes.

Q: But that's not the correct interpretation?

A: No, it isn't.

Defendant contends the prosecutor's question "if [defendant] said he was there how could you miss him?" incorrectly suggested defendant previously admitted he was present at the dice game. The State acknowledges the prosecutor's initial interpretation of the police report was incorrect, but argues the trial court did not err in denying defendant a mistrial because the prosecutor had a good faith basis for his question. Defendant asserts the prosecutor could not have had a good faith basis for the question because he failed to ask Detective Stidum the correct interpretation of "he" in the police report.

This court should not and will not presume the prosecutor acted in bad faith posing the question without some evidence of bad faith conduct. *State v. Guidorzi,* 895 S.W.2d 225, 230 (Mo.App.1995). In this case,

the word "he" was ambiguous enough to cause the prosecutor, the court, and even the author of the report, Detective Stidum, to become confused. In truth, defense counsel's own statement "in good faith I believed the reference was directly to David Williams being present at the time of the homicide" implies she too was uncertain as to who "he" referred to when reading the police report after learning of the prosecutor's interpretation. Similarly, there is nothing in the record from which it may be inferred that when the prosecutor asked the question he knew the correct interpretation of the police report. We also cannot agree with defendant that the prosecutor's failure to question Detective Stidum regarding the ambiguous use of "he" in the police report amounted to bad faith on the prosecutor's part. It is clear from the record, the prosecutor did not consider the word "he" ambiguous until the defense counsel disputed his interpretation. We also note the trial court did not allow any further question in this regard.

Defendant raises several other subpoints pertaining to his contention the trial court erred in refusing to grant a mistrial. We find they are also without merit. Point denied.

Defendant's second point on appeal is the trial court erred in overruling his timely motion to disallow two of the State's peremptory strikes on the basis of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, defendant challenges as pretextual the explanations given by the state for striking venirepersons Audrey Clerkley and Henry Prince.

■ A defendant may establish a prima facie case of discrimination by showing: (1) that defendant is a member of a cognizable racial group; (2) that the state exercised peremptory challenges to remove members of defendant's race from the venire; and (3) that the facts and any other relevant circumstances raise an inference the state used the venire practice to exclude venire from the petit jury on account of their race. *State v. Antwine*, 743 S.W.2d 51, 64 (Mo. banc 1987).

Defendant is an African–American. Venirepersons Clerkley and Prince are also African–Americans. The State used five of its six peremptory challenges to strike African–American venirepersons. However, the record does not disclose the makeup of the jury as finally selected.

In striking venireperson Clerkley, the prosecutor explained:

Judge, I struck Miss Clerkley, No. 484. Miss Clerkley responded to [defense counsel's] leading question in, I believe, a manner intended to make her answer conform to what she thought [defense counsel] wanted, when [defense counsel] was expanding on whether or not the jurors expected the defendant to put evidence on that he is not guilty. She said that to find the defendant not guilty she must hear from the defendant. Then immediately when [defense counsel] knew that that was not an answer she wanted to receive from Miss Clerkley, [defense counsel] talked to her and she immediately flip-flopped in order to, in my estimation, make her position coincide with what she thought [defense counsel] wanted. And therefore I think she's aligned with [defense counsel] from the get-go, and would rather not have her on the jury.... My point is the alacrity with which Miss Clerkley seemed to conform her position with what it seemed [defense counsel] was seeking. That's the impression I was left with. That's why she's being struck.

The prosecutor struck venireperson Prince because he was married to a social worker and it was the prosecutor's impression social workers, and those closely associated with social workers, were more likely to be sympathetic to defendants than other jurors.

■ Our review of the trial court's denial of defendant's *Batson* challenge is limited to determining whether it is clearly erroneous. *State v. Shurn*, 866 S.W.2d 447, 456 (Mo. banc 1993). Clear error is established only when this court is left with a "definite and firm conviction a mistake has been made." *State v. Hayden*, 878 S.W.2d 883, 884–85 (Mo.App.1994).

■ The trial court has considerable discretion to determine the plausibility of the State's explanations and thus whether the

defendant established that the State purposefully discriminated in using peremptory strikes. *State v. Parker*, 836 S.W.2d 930, 934 (Mo. banc 1992). "To be sufficient the explanation need only be race-neutral, reasonably specific and clear, and related to the particular case to be tried." *Id.* Unless a discriminatory intent is inherent in the State's explanation, the reason offered will be deemed race-neutral. *Id.*

■■■■■ A review of the record demonstrates the State provided plausible, legitimate reasons for striking venirepersons Clerkley and Prince. The State could reasonably believe these venirepersons might not be sympathetic to its case and might not follow the law. Regarding venireperson Clerkley, we acknowledge the State did not strike all persons who initially stated they wanted to hear defendant testify in his own defense and then, upon further questioning by defense counsel, indicated they could follow the law on defendant's right not to testify. However, the State distinguished venireperson Clerkley because of the alacrity with which she changed her mind and the prosecutor's belief her abrupt change of mind was motivated by the desire to please defense counsel. The exercise of peremptory challenges is the product of the subjective analyses of a variety of character and personality traits perceived by counsel. *Batson* does not prohibit "hunch" challenges so long as racial animus is not the motive. *State v. Antwine*, 743 S.W.2d at 67. The trial court's refusal to disallow two of the State's strikes did not violate the *Batson* rule. Point denied.

In his third point on appeal, defendant argues the trial court improperly overruled his motion to sever Count I and Count II as the offenses were committed approximately one week apart, in different locations, no similar "tactics" were involved, and the manner in which the murders were committed were "not so similar that it is likely that the same person committed" both offenses. The State contends the counts were properly tried in one trial because the murders were part of a common scheme or plan.

■■■■■ In determining whether there has been a misjoinder of offenses under Rule 23.05 only the State's evidence is considered. *State v. Smith*, 682 S.W.2d 861, 863 (Mo.App. 1984). Liberal joinder of criminal charges is favored in the interest of judicial economy. *Id.*

■■■■■ The charges were properly joined if the incidents were part of a "common scheme or plan" or were part of the same transaction. *State v. Buford*, 582 S.W.2d 298, 302 (Mo.App.1979). The essential test in determining whether a common scheme or plan exists, in a case involving a single defendant acting alone, is the requirement that the offenses charged must be the product of a single or continuing motive. *State v. McCrary*, 621 S.W.2d 266, 271 (Mo. banc 1981).[2]

We find the present case factually analogous to *State v. Jolliff*, 867 S.W.2d 256 (Mo. App.1993). In *Jolliff*, a "common scheme or plan" was held to exist where the defendant shot the victim on two separate occasions approximately six months apart. Joinder was found proper because the defendant's actions were the product of a single, continuing motive in that defendant shot the victim the second time only because he was unsuccessful the first time or, alternatively, defendant shot the victim the second time to prevent the victim from testifying against him concerning the first shooting.

■■■■■ Here, the State's evidence showed the offenses are related by an element of a single or continuing motive. The evidence showed defendant shot Sipes because Sipes allegedly stole drugs from Tawana. The evidence also showed, defendant shot Williams to prevent him from identifying defendant as Sipes' murderer to the authorities. In short, the second shooting occurred solely because of the first shooting. Therefore, the two shooting incidents fall within the "common scheme or plan" language sufficiently to constitute proper joinder. It is not necessary to find that prior to Sipes' murder, defendant

**2.** *State v. McCrary* considered Rule 23.05(b) but that rule was amended effective January 1, 1982 to its present form.

also intended to murder Williams. *Id.* at 259. "When someone begins a course of criminal conduct against a single victim or group of victims, the consequences of the criminal act may alter the course of subsequent criminal acts. If tried separately the evidence of both crimes would have been admissible in each trial." *Id.* The trial court did not err by trying both offenses in one proceeding. Point denied.

In defendant's fourth point on appeal, he argues the trial court erred in admitting testimony indicating defendant confronted Sipes about "the dope he had took from Tawana." Defendant contends this evidence should not have been admitted because it concerned a crime for which he was not charged and was not relevant to the crime charged.

▆▆▆▆ Generally, evidence of uncharged crimes, wrongs, or acts is inadmissible for the purpose of showing the propensity of the defendant to commit the crime with which he is charged. *State v. Bernard,* 849 S.W.2d 10, 13 (Mo. banc 1993). As an exception to the general rule, evidence of prior misconduct is admissible if it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial. *Id.* Evidence of uncharged misconduct may be admissible to prove the specific crime charged when it tends to establish: (1) motive; (2) intent; (3) absence of mistake; (4) common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; or (5) identity of the person charged with the commission of the crime. *Id.* "However, even evidence that does not fall within one of these five enumerated exceptions may be admissible if the evidence is legally and logically relevant." *State v. Brown,* 867 S.W.2d 530, 534 (Mo.App.1993).

▆▆▆▆ The testimony regarding defendant's confrontation with Sipes about the drugs Sipes allegedly "took from Tawana" tended to establish the identity of the murderer and the motive for the crime. The evidence was logically relevant because it tended to establish directly that defendant murdered Sipes as retaliation for Sipes' theft from Tawana. Similarly, it tends to establish that defendant

murdered Williams to prevent Williams from identifying defendant as Sipes' murderer to the authorities. Through this logical, sequential presentation of the evidence, the State was able to identify defendant as the murderer of Sipes and Williams. The evidence of the confrontation between defendant and Sipes regarding the drugs allegedly stolen from Tawana was logically and legally relevant. Additionally, the testimony regarding defendant's confrontation with Sipes did not associate defendant with the commission of other crimes. It only established that Sipes allegedly took drugs from Tawana, not that defendant possessed those drugs. Point denied.

The judgment of the trial court is affirmed.

PUDLOWSKI, P.J., and SIMON, J., concur.