STATE of Missouri, Respondent,

v.

Thomas BROOKS, Jr., Appellant.

No. 78396.

Supreme Court of Missouri,
En Banc.

Dec. 23, 1997.

Rehearing Denied Jan. 27, 1998.

Pete Carter, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Becky Owenson Kilpatrick, Asst. Atty. Gen., Jefferson City, for Respondent.

COVINGTON, Judge.

Appellant, Thomas Brooks, Jr., was convicted of the class A felony of murder in the first degree, in violation of 565.020, RSMo 1994, for which he was sentenced to death, and the felonies of armed criminal action, section 571.015, RSMo 1994, kidnapping, section 565.110, RSMo 1994, and attempted forcible rape, section 566.030, RSMo Supp.1993. Appellant appeals his first degree murder conviction, his sentence, and the overruling of his Rule 29.15 post-conviction motion. Affirmed.

The evidence is viewed in the light most favorable to the verdict. *State v. Kreutzer,* 928 S.W.2d 854, 859 (Mo. banc 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 752, 136 L.Ed.2d 689 (1997). On December 1, 1993, Cassidy Senter, a female child, ten years of age, returned to her home from school. She and her mother, Rhonda Senter, lived in the

lower half of Michael Goldbeck's home on Tall Tree Court in Hazelwood, St. Louis County. When Cassidy arrived at home, she visited briefly with Mr. Goldbeck. Mr. Goldbeck tested Cassidy's personal alarm to make sure it was functioning properly before Cassidy left the house. Cassidy then headed up Tall Tree Court toward a friend's house at about 3:30 p.m. She was last seen at an intersection where Tall Tree Court became Spring Forest Lane.

Also at around 3:30 p.m., Mr. and Mrs. Hanneke, who resided on Spring Forest Lane next door to Cassandra Quinn, appellant's sister, heard a noise and followed the sound to identify it. The Hannekes found a yellow alarm and a pen near their property line. The alarm was buzzing.

A few minutes after 5:00 p.m., Rhonda Senter returned from work. When she telephoned Cassidy's friend's house, she learned that Cassidy had never arrived. After Ms. Senter and Mr. Goldbeck searched in vain for Cassidy, Mr. Goldbeck telephoned the police. Around the same time, Mr. Goldbeck received word that Cassidy's personal alarm was found on the Hannekes' lawn. When Mr. Goldbeck told this to the police, the police instituted a ground and air search almost immediately. The search continued for days.

On December 7, 1993, a detective began to re-interview people who lived in the neighborhood where the alarm was found. At this time, the detective spoke to appellant's sister, Cassandra Quinn, and learned where appellant could be found.

On December 9, 1993, two persons walking in the city of St. Louis discovered Cassidy Senter's body in an alley. The child was wrapped in two bed comforters and a pink curtain. Her jacket and sweater were pulled up above her chest. Her jeans were pulled down over her ankles, inside out. A sheet was looped around each of her ankles and then tied in the middle to hold the ankles together.

The autopsy examination revealed decomposition in the upper portion of Cassidy Senter's body. There were at least four tears to the scalp and multiple fractures in the skull.

There were bruises on Cassidy's chin, right cheek, right shoulder, breast bone, abdomen, each side of her chest wall, and on the upper back at the base of the neck. Numerous other bruises were found over her body.

The condition of Cassidy Senter's scalp indicated that she was alive when she received many of her injuries. The physician who performed the autopsy opined that there were at least five blows to the head and that the blows were significant enough to have caused her death. The physician concluded that Cassidy died from the head injuries. It appeared that Cassidy lived less than an hour after the blows were sustained.

Examination of tire tracks left at the scene where the body was found revealed a unique tire pattern that could have been made only by a Goodyear Work Horse Light Tire Truck. Police investigation revealed that appellant had arranged a local rental from a U–Haul rental company in Hazelwood on December 8 for a twenty-four hour period. On December 9, a neighbor of Cassandra Quinn, appellant's sister, saw a U–Haul truck backing out of the driveway at Cassandra Quinn's home. The body was discovered that day. A comparison of the tire tracks left where the body was discovered to the tires on the U–Haul truck that appellant rented revealed a positive match between several of the tires and the tracks.

Police also discovered that Denise Johnson, who had occupied Quinn's home prior to Quinn's occupancy, had left behind a pink floral comforter and pink curtains similar to the ones found on Cassidy's body when Ms. Johnson moved from the house.

Appellant was arrested on February 3, 1993. Police conducted a search of appellant's sister's home. Hair and fiber evidence taken from the home and from Cassidy's body and the wrappings in which she was found revealed several matches. Fibers from the residence matched fibers taken from morgue sheets, both comforters, the curtain, and the victim's panties, socks, jacket, and blouse. DNA testing revealed that Cassidy's blood matched that found in stains on the basement floor at Cassandra Quinn's home. A bed slat taken from the basement of Quinn's home was consistent with having

caused the injuries suffered by Cassidy. Testing revealed that paint from the U–Haul dolly matched paint samples taken from the sheets, comforters, and clothing found on Cassidy in color, texture, chemical composition. The forensic evidence recited here represents only a portion of the forensic evidence presented at trial.

Appellant agreed to talk to a detective. Appellant initially denied any involvement in Cassidy's death. Eventually, he responded to certain questions from the detective. He changed his statement more than once. Ultimately, he stated that he had been on the telephone when he noticed Cassidy walking up the yard to his sister's house. When he opened the door, Cassidy asked appellant if his nephews were at home. Appellant stated that he grabbed her by the hand and dragged her down the basement steps. Cassidy fell down the steps. The fall activated the personal alarm, which appellant stated he picked up, took back upstairs, and threw into the street. He then returned downstairs where he told Cassidy to pull her pants down. She was screaming and searching for a way out of the house. Appellant stated that he decided to kill Cassidy because he realized that if he let her go, she would say that he tried to rape her. He found a bed slat on the floor and hit Cassidy in the head four times until she dropped. He covered the body with bedding and drapery, then left for work.

Appellant stated that Quinn told him the next day that she did not want to know anything about the body in her basement; she just wanted him to get rid of it. Some time later, appellant returned to Quinn's house and moved the body from where it had fallen to behind the freezer, in an attempt to conceal it. On December 8, appellant rented the U–Haul truck, drove it to work, worked his shift, then went to Quinn's house where he removed the body with the two-wheel dolly and drove it to the place where the body was later recovered.

The jury returned guilty verdicts on all counts charged. In the penalty phase, the state introduced additional evidence of prior convictions along with the testimony of Cassidy's mother and Cassidy's elementary school principal.

Appellant did not testify at trial or at the penalty phase. During the penalty phase, appellant's relatives testified regarding abuse, neglect, and trauma he suffered as a child. Two psychologists explained the manner in which childhood abuse and appellant's low intelligence contributed to appellant's commission of the crime.

The jury returned a verdict finding that the death penalty was the appropriate punishment for the murder of Cassidy Senter.

Appellant brings this appeal from his conviction and sentence of death, as well as from the motion court's denial without evidentiary hearing of appellant's Rule 29.15 motions.

## I.

Appellant alleges that the trial court erred in ordering "change of venue" from St. Louis County to Greene County, thereby depriving him of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and art. I, section 10, 18(a) and 22(a) of the Missouri Constitution. He contends that as an African–American, he has a right to a venire that fairly represents a cross-section of the community where the crime was committed and that St. Louis County has a population with a much higher percentage of African–Americans than Greene County. He alleges that Jackson County, also available, has demographics that more closely resemble St. Louis County and that no compelling reason required transfer to Greene County.

Appellant filed a motion requesting that the court change venue to another county or impanel a jury from another county. His motion was based principally upon the fact of extensive media coverage of the crime at the time the victim was found to be missing. Appellant requested that venue be within a circuit having a demographic make-up similar to that of St. Louis County. The trial court sustained the motion and ordered venue changed to Greene County "under the provisions of section 494.505 RSMo." Because Greene County is neither in the same circuit as St. Louis County nor in the circuit

adjoining St. Louis County, "the chief justice of the supreme court of the state of Missouri" is required to name the county from which the jury is drawn. By order of May 16, 1995, the chief justice designated Greene County as the county from which jurors would be summoned.

At the commencement of trial, as the general venire panel was seated, appellant objected to the choice of Greene County as the county from which the jurors were drawn. Appellant noted that Greene County is not demographically the same as St. Louis County and that all of the approximately ninety persons on the venire panel were white except for three who appeared to be African–American.

■ It is well established that a criminal defendant has a constitutional right to the unbiased selection of a jury drawn from a fair cross-section of the community. *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668–69, 58 L.Ed.2d 579 (1979). To establish a *prima facie* violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the under-representation is a consequence of a systematic exclusion of the group in the jury-selection process. *Id.*

Appellant argues that the transfer of venue from St. Louis County to Greene County denied appellant his right to the selection of a jury drawn from a fair cross section of the community. Appellant points to the fact that the 1990 U.S. Census shows that St. Louis County had a population that was fourteen percent African–American, but Greene County had a population that was only one and seven-tenths percent African–American. Appellant argues that this demographic dispari-

ty resulted in the underrepresentation of African–Americans on his jury venire.[1]

■ Appellant presents no proof of systematic exclusion. His sole evidence of underrepresentation relates to the representation of African–Americans on the venire in this case. Appellant has presented no evidence, and does not claim, that the venue transfer mechanism used in this case results in the systematic underrepresentation of African–Americans on venires. "Evidence of the underrepresentation or nonrepresentation of a distinctive group on a particular jury panel does not establish the systematic exclusion of that group." *State v. Vinson,* 834 S.W.2d 824, 828 (Mo.App.1992). Furthermore, contrary to appellant's assertion, the mere proof of the statistical disparity of African–American populations in St. Louis and Greene County does not establish any purposeful discrimination in the change of venue to Greene County. *See Mallett v. State,* 769 S.W.2d 77, 80 (Mo. banc 1989), *cert. denied,* 494 U.S. 1009, 110 S.Ct. 1308, 108 L.Ed.2d 484 (1990).

■ Appellant argues that this Court should find that the transfer of venue to a county with "virtually no African–American" population constitutes per se systematic exclusion. It is fundamental that the requirement of systematic exclusion requires that the underrepresentation be caused by a flaw in the jury system that is "systematic—that is, inherent in the particular jury-selection process utilized." *Duren,* 439 U.S. at 366, 99 S.Ct. at 669. Holding that one act constitutes per se systematic exclusion would be a contradiction in terms. Essentially, appellant is asking this Court to abrogate the requirement of systematic exclusion in venue-transfer cases similar to the instant one. Appellant has presented no reason why this Court should do so and has cited no cases from any jurisdictions that have; therefore, this Court declines appellant's invitation. *See State v. Mallett,* 732 S.W.2d 527, 540

---

1. Although appellant relies exclusively upon the fair cross-section analysis set out in *Duren,* it is questionable whether this analysis should apply in the instant case. Normally, the *Duren* analysis is applied to determine whether a venire drawn from community "A" fairly represents that com-
munity. Here, appellant is asking this Court to apply the *Duren* analysis to determine whether a venire drawn from community "A" fairly represents a different community, one from which appellant asked that venue be transferred.

(Mo. banc), *cert. denied,* 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987); *Mallett v. State,* 769 S.W.2d at 80.

Appellant has presented no proof of discriminatory purpose in the transfer of venue to Greene County. Appellant also has failed to prove that the transfer mechanism at issue in this case results in the systematic exclusion of African–Americans on jury venires. Consequently, the point is denied.

## II.

Appellant contends that the trial court erred in overruling his *Batson* [2] challenge to the state's use of a peremptory strike against venireperson Pauline Diemer, the sole African–American member of the venire remaining after other venirepersons were struck for cause.

■■■ A claim that the state's strikes violate *Batson* requires the trial court to conduct a three-step inquiry. First, the defendant must raise a *Batson* challenge with regard to one or more specific venirepersons struck by the state and must identify the cognizable racial group to which the venireperson or persons belong. The state then must present reasonably specific and clear race-neutral explanations for the challenged strike. Assuming the prosecutor is able to articulate an acceptable reason for the strike, the defendant then needs to show that the state's proffered reasons for the strike were merely pretextual and that the strikes were racially motivated. *State v. Parker,* 836 S.W.2d 930, 939–40 (Mo. banc), *cert. denied,* 506 U.S. 1014, 113 S.Ct. 636, 121 L.Ed.2d 566 (1992). The state's reasons for the strike need only be facially race-neutral. Unless a discriminatory intent is inherent within the explanation, the explanation will be deemed race-neutral, even if it is not persuasive or even plausible. *Purkett v. Elem,* 514 U.S. 765, 767–68, 115 S.Ct. 1769, 1770–71, 131 L.Ed.2d 834 (1995).

■■■ The trial court's determination regarding purposeful discrimination is a finding of fact that will not be overturned on appeal unless clearly erroneous. *Parker,* 836 S.W.2d at 939, n. 7. The trial court takes into account a variety of factors in determining whether the defendant has carried the burden to establish the existence of purposeful discrimination. The chief consideration should be the plausibility of the prosecutor's explanations in view of the totality of the facts and circumstances surrounding the case. *Parker,* 836 S.W.2d at 939.

Ms. Diemer, as appellant noted, was the only African–American person remaining on the venire after the other two African–American persons had been struck for cause during the death penalty qualification process. The prosecutor offered three factors upon which he based his strike: Ms. Diemer had no children; she had some knowledge of DNA about which the prosecutor expressed concern that "a little knowledge" about DNA typing methods could be even more harmful than none at all; and she gave a weak response regarding her ability to impose the death penalty.

In response, appellant asserts that because the state struck the sole remaining African–American member of the venire and because there were similarly situated white members on the venire who were not struck by the state, the trial court clearly erred in sustaining the state's strike of Ms. Diemer.

■■■ First, as a matter of law, disparate impact alone does not convert a facially race-neutral explanation into a per se violation of equal protection. *Parker,* 836 S.W.2d at 934. Although striking the sole remaining African–American member of the venire is a relevant factor, it is not the only factor; it should be taken into account by the court along with a multitude of other factors in making a determination of whether a violation of equal protection has occurred. *Id.*

■■■ The additional factors appellant raises are that Sherry Smith and Sandy Wilson were similarly situated and were not struck by the state. Appellant claims that venireperson Smith was a similarly situated white member of the venire because she had no children of her own. In this respect, appellant is correct. Not having children, however, was only one of three reasons offered by

**2.** *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

the state for striking Ms. Diemer. The other two reasons did not apply to Ms. Smith; therefore, Ms. Smith was not similarly situated to Ms. Diemer. *State v. Kempker*, 824 S.W.2d 909, 910 (Mo. banc 1992). A reason given by the state for striking a venireperson is not necessarily pretextual simply because that reason by itself did not compel the prosecutor to strike any members of the panel. *Id.*

■■■ Appellant asserts that venireperson Wilson was similarly situated because she also had some knowledge of DNA. There is, however, a distinction between Ms. Diemer and Ms. Wilson with respect to the level of their knowledge about DNA typing. The prosecutor's concern that "a little knowledge" about typing methods might be more harmful than no knowledge is not completely without foundation. Ms. Wilson's background as a nurse provided her with some familiarity with "general principles." Ms. Diemer, in contrast, had more than a mere familiarity with general principles of DNA typing. She supervised a section of the clinical laboratory at a regional health center. Although her lab did not perform DNA typing, she was familiar with it because she had to teach her students about DNA, she stated. When questioned about her familiarity with the PCR method of testing, Ms. Diemer stated that she was familiar with it, but it did not mean "a lot" to her. The distinction between Ms. Diemer and Ms. Wilson is evident on the issue of DNA knowledge alone.

Appellant also responds that the state's explanation that Ms. Diemer was weak regarding imposition of the death penalty was pretextual. Appellant rests his contention in principal part, it appears, upon appellant's observation that the prosecutor asked only general questions of the *Witherspoon* panel of which Ms. Diemer was a part and, after appellant's attorney finished her voir dire of the panel, including a one-on-one session with Ms. Diemer, the prosecutor stated that he had no other questions. When questioned by appellant's counsel, Ms. Diemer stated that she believed that she could consider both punishments. Appellant charges that it must necessarily follow that the state's explanation was not acceptable.

■■■ Appellant's contention is without merit. The prosecutor was able to observe Ms. Diemer throughout the voir dire. The prosecutor conceded that Ms. Diemer responded that she could consider either punishment. He stated that he nevertheless felt that her demeanor in response to the questions reflected that she was hesitant and uncomfortable with the idea. Both the demeanor of the venireperson and the person's stance on the death penalty are proper factors to consider and reasonable grounds for striking a venireperson.

Appellant fails to show that the only reasons proffered by the prosecution were pretextual or that any of the other venirepersons were similarly situated. Appellant's arguments, therefore, fall far short of showing that the trial court clearly erred in overruling appellant's *Batson* challenge.

### III.

■■■ Appellant contends that the trial court erred in overruling his motion for a mistrial when Rhonda Senter, Cassidy's mother, "screamed" at appellant from the audience of the courtroom, in the presence of the jury, "You'll burn in hell for this." Appellant claims that the trial court's refusal to grant a mistrial violated his rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and art. 1, sections 10, 18(a), 19, and 21 of the Missouri Constitution.

During the state's case-in-chief, William Ostendorf, a detective, took the stand to testify on behalf of the state. He testified regarding his interviews with appellant after appellant was taken into custody. He began to testify with respect to the initial statement that appellant gave after appellant ceased to deny his involvement in the murder. Detective Ostendorf testified:

I then asked him to tell me what happened. He said that he was at his sister's house, Cassandra's house on the telephone, he was going to telephone. He heard some noises downstairs. This is a split level house. He went down to investigate and as he did he saw Cassidy standing there. And as he approached her he said

that Cassidy pulled her pants down and asked him to have sex with her.

At this time in the testimony, defense counsel asked to approach the bench. He told the court that he wanted the record to reflect that there was an outburst in the courtroom from Rhonda Senter and other family or friends. The court responded that he heard only one, that being from Rhonda Senter. Counsel responded that Rhonda Senter was outside screaming at that very moment and, in addition, that when she was in the courtroom screaming she said, "You are going to burn in hell." Counsel moved for a mistrial on the basis that the outburst would prevent the jury from listening to further evidence and deciding in any objective fashion. The trial court denied the motion for mistrial and ordered that Rhonda Senter *not be allowed* back in the courtroom. Detective Ostendorf continued his testimony.

The following day, the trial court discussed in chambers the outburst from Ms. Senter. First, the trial court summarized the detective's testimony. Then, the trial court described his view of the occurrence for the record. His recollection was essentially the same as that described by appellant's counsel. For the record, the trial court clarified that the entire incident took less than a minute, that Ms. Senter was in the courtroom because of the rights afforded her under the victim's rights statutes, and that she was removed almost immediately after the outburst. Defense counsel agreed that the incident was brief and even "understandable" in view of the chilling testimony, but disagreed with the trial court's ruling in refusing to grant a mistrial.

The trial court ordered the prosecutor to keep Ms. Senter out of the courtroom during any testimony that might provoke emotions. The court denied appellant's request for a mistrial, particularly in view of the spontaneity and unprompted nature of the outburst. The trial court then undertook an extensive discussion with respect to controlling any further possibility for outbursts in the remainder of the trial.

Appellant relies on *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), in support of his assertion of what he denominates extra-judicial communications with the jury. In *Remmer,* after the jury had returned its verdict, the petitioner learned for the first time that during the trial a person had communicated with a certain juror, who afterwards became the jury foreman, and remarked to him that he could profit by bringing in a verdict that was favorable to the petitioner. *Id.* at 228. The juror reported the incident to the judge, who informed the prosecuting attorneys and advised with them. *Id.* An investigation took place, the report of which was considered by the judge and the prosecutors alone, and they concluded that the statement to the juror was made in jest and did nothing further. *Id.* The petitioner in *Remmer* was never informed of the incident; he learned of the matter by reading of it in the newspapers after the verdict. *Id.* The United States Supreme Court held that any private communication in a criminal case, direct or indirect, with a juror during trial about the matter pending before the jury is deemed presumptively prejudicial. *Id.* at 229, 74 S.Ct. at 451 The burden rests heavily upon the government to establish that the contact with the juror was harmless to the defendant. *Id.* The defendant is to be afforded notice and an opportunity to be heard. *Id.* In *Remmer,* the Court remanded for the trial court to determine the circumstances, the impact on the jury, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate. *Id.* at 229–30, 74 S.Ct. at 451–52.

*Remmer* is of no assistance to appellant. It is both factually and legally distinguishable. No private communication with the jury occurred in this case. The spontaneous outburst in the instant case is different in both content and character from the communication at issue in *Remmer.* Furthermore, the trial court in the present case was, at the time of the outburst and the following day, able to determine the circumstances of Ms. Senter's outburst, the impact upon the jury, and whether the outburst was prejudicial, and it was able to do so with all interested parties participating. Considering the nature of the communication and the trial court's action in this case, *Remmer* does not

compel a remand to the trial court for a hearing to consider the issue of prejudice.

Missouri courts have confronted claims such as appellant's in determining the effect of outbursts during the course of trial and the potential prejudice created by emotional behavior. It is without cavil that emotional outbursts are to be prevented insofar as possible. *State v. Johnson,* 672 S.W.2d 160, 163 (Mo.App.1984). Where outbursts occur, the trial court may exercise broad discretion in minimizing or eliminating the prejudicial impact of an hysterical witness or gallery member. *Id.* In determining whether to declare a mistrial, the trial court may consider the spontaneity of the outburst, whether the prosecution was at fault, whether something similar, or even worse, could occur on retrial, and the further conduct of the trial. *See State v. Hamilton,* 791 S.W.2d 789, 795 (Mo.App.1990); *State v. Johnson,* 672 S.W.2d at 163.

The trial court's thoughtful observations with respect to the spontaneous occurrence in this case constituted a proper exercise of discretion. Furthermore, in view of appellant's admission of responsibility, excluding deliberation, and the overwhelming evidence against appellant, any prejudicial effect of Rhonda Senter's outburst would not require the extreme remedy of a mistrial. Point denied.

## IV.

Appellant contends that the trial court erred in denying his motion for a mistrial after the bailiffs handcuffed appellant in front of the jury as the guilty verdicts were being read. Appellant asserts that this conduct was prejudicial because the jury had yet to determine the penalty and the handcuffing created the impression that appellant was dangerous and needed to be restrained. Appellant claims deprivation of his right to a fair and impartial jury, a fair and impartial trial, and equal protection under the law.

Following the reading of the guilty verdicts on all four counts into the record, and shortly before the jury was dismissed for the day, defense counsel approached the bench. He noted that while the verdicts were being read, the deputies had caused appellant to stand, handcuffed him, then caused him to sit again in his chair, in full view of the jury. Counsel requested a mistrial with regard to the punishment phase. The trial court acknowledged that the deputies had done as counsel stated, but denied appellant's request for a mistrial. The following day counsel repeated his request for a mistrial, although he acknowledged that he had learned that the procedures conducted by the deputies constituted their standard operating procedure after the rendering of a guilty verdict. Counsel stated that he understood that neither the trial court nor the state was responsible for the bailiffs' conduct. In response, the trial court noted that the incident had occurred in a matter of seconds and further noted that the verdict had been returned before the handcuffing took place. The trial court found no prejudice and denied appellant's second motion for a mistrial.

Appellant's allegation of error is not meritorious. Because the trial court observes first hand what occurs in the courtroom, the trial court has considerable discretion in deciding whether to grant a mistrial. The declaration of a mistrial is a drastic remedy and should be employed only in the most extraordinary circumstances. *State v. Sidebottom,* 753 S.W.2d 915, 919–920 (Mo. banc), *cert. denied,* 488 U.S. 975, 109 S.Ct. 515, 102 L.Ed.2d 550 (1988). The trial court did not abuse its discretion by refusing to grant a mistrial in this case. Although shackling in the presence of the jury should be avoided if possible, *see Illinois v. Allen,* 397 U.S. 337, 344–45, 90 S.Ct. 1057, 1061–62, 25 L.Ed.2d 353 (1970), not every incident in which a jury observes the defendant in shackles requires a mistrial. *See, e.g., State v. Beal,* 470 S.W.2d 509, 515–16 (Mo. banc 1971); *State v. Clements,* 849 S.W.2d 640, 646–47 (Mo.App.1993); *State v. McMillian,* 779 S.W.2d 670, 672 (Mo.App.1989). In this case, the jury saw appellant only after the close of the guilt phase, the jury observed him in shackles only briefly, the jury was dismissed shortly thereafter, and appellant appeared without restraints throughout the remainder of the trial. The minimal threat of prejudice to appellant in the penalty phase of this trial from his brief appearance in

shackles after the jury had just returned guilty verdicts of first degree murder, kidnapping, attempted rape, and armed criminal action did not require the drastic remedy of a mistrial. *See McMillian,* 779 S.W.2d at 672.

In connection with this point, appellant also accuses the trial court and the prosecution of bad faith because the trial court had earlier sustained appellant's pre-trial motion to appear without restraint. Appellant's assertions of bad faith are utterly without foundation. The point is denied.

## V.

Appellant contends that the trial court erred in overruling his objections and motions for mistrial when the prosecutor cross-examined defense expert Dr. Eric Engum during the penalty phase of the trial about a "page from an unmarked, unadmitted document that contained a hearsay report of an alleged attempted sexual assault committed by [appellant] while in prison awaiting trial, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 10, 18(a), 21, and 22 of the Missouri Constitution."

The defense called Dr. Engum to testify in the penalty phase with respect to appellant's mental deficiencies. On cross-examination, the prosecutor asked Dr. Engum about the lack of structure in appellant's life, which Dr. Engum had earlier testified affected appellant's personality problems. The prosecutor asked Dr. Engum whether he was provided with Mr. Brooks' prison records. Dr. Engum responded that he was not. The prosecutor then inquired whether Dr. Engum was aware of any of appellant's antisocial behavior in prison. Appellant's counsel objected. The court overruled the objection. Dr. Engum responded that he was not aware of any behavioral problems appellant had in prison, other than being victimized.

The prosecutor then inquired of Dr. Engum whether he was aware of anything in the information he had received that showed appellant's aggressive and antisocial behavior while in prison. Defense counsel again objected on the grounds that nothing had been provided in discovery, that the state had

never endorsed anyone to lay a foundation for the admission of the records, and on additional grounds. The prosecutor responded that he was testing the basis of the defense expert's opinion and that he wanted to find out whether the expert's diagnosis would be altered if he knew about appellant's aggressive behavior in prison.

The trial court ruled that the prosecutor had a right to inquire into aspects of appellant's life through recent information, which could be used or not used to challenge the expert's diagnosis. The prosecutor then continued to question Dr. Engum about whether or not he had been given appellant's prison records. Dr. Engum responded that he had not.

Over defense counsel's objections, the prosecutor then questioned Dr. Engum specifically about an allegation that appellant sexually assaulted his cell mate, and the prosecutor showed Dr. Engum part of appellant's prison records, which Dr. Engum read to himself. The prosecutor asked Dr. Engum if he was aware that in November of 1994 appellant tried to sexually assault his cell mate. Engum responded that he was not. The prosecutor also asked if such information affected Dr. Engum's opinion about appellant's personality traits. Engum replied that it might. Finally, the prosecutor asked whether Dr. Engum had any more personal knowledge of the facts supporting his expert opinion than he did of the allegation contained in appellant's prison records. Engum responded that he did not.

## A.

Appellant asserts that the trial court erred in overruling his objections because the state failed to provide discovery of the prison records pursuant to Rule 25. The rule requires, in pertinent part, timely and continuing production of any books, papers, and documents the state intends to introduce into evidence at the hearing or trial. 25.03(A)(6). Rule 25 is of no assistance to appellant. There is no indication whatsoever that the state intended to introduce the prison records into evidence. Because the state merely cross-examined a defense expert regarding

the information in the records, the state was not required to disclose the prison records upon which it relied. The trial court did not err in overruling appellant's objections. *See State v. Brock,* 778 S.W.2d 13, 14–15 (Mo. App.1989) (finding that Rule 25.03(A)(6) did not require disclosure of defendant's prior convictions when state used information only to cross-examine defendant); *see also State v. Shurn,* 866 S.W.2d 447, 463 (Mo. banc 1993), *cert. denied,* 513 U.S. 837, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994) (finding that state has no duty to disclose a defendant's prior arrests before cross-examining about them).

### B.

 Appellant next asserts that the trial court erred in overruling appellant's objections to the state's cross-examination because no foundation was laid for admitting the documents into evidence and portions of the documents constituted inadmissible hearsay. Appellant's contentions regarding the admissibility of the prison records are misplaced because the state never admitted the records as evidence; the state used the records only to cross-examine appellant's expert witness. *See State v. Conrad,* 719 S.W.2d 104, 106–07 (Mo.App.1986). It is well established that an expert witness may be cross-examined regarding facts not in evidence to test his qualifications, skills, and credibility or to test the validity and weight of his opinion. *State v. Goree,* 762 S.W.2d 20, 23 (Mo. banc 1988); *State v. Rowe,* 838 S.W.2d 103, 110 (Mo.App.1992). Wide latitude is afforded the cross-examination of witnesses to test qualifications, credibility, skill or knowledge, and the value and accuracy of the expert's opinion. *See Callahan v. Cardinal Glennon Hosp.,* 863 S.W.2d 852, 869 (Mo. banc 1993). The sources of information used to cross-examine a witness can include hearsay and do not need to be admissible as evidence. *See Goree,* 762 S.W.2d at 23; *Conrad,* 719 S.W.2d at 107.

 Dr. Engum offered his opinion that appellant's personality disorder would be controlled by the structured environment of a prison. He also testified that prison records were the type of records that members of his profession might rely upon in forming their opinions; therefore, the prosecution did not exceed the scope of cross-examination in asking Dr. Engum about whether he had been provided appellant's prison records in making his determination and whether his opinion would be different if he knew about appellant's conduct in prison. *See Goree,* 762 S.W.2d at 23. The state had the right to rely on appellant's prison records in cross-examining Dr. Engum, regardless of the records' admissibility. *See id.*

### C.–D.

Subpoints C and D are premised on appellant's assertion that the prison records demonstrate that prison authorities found that appellant did not attempt to assault his fellow inmate as implied by the state. The documents in appellant's prison file reveal the following: An inter-office communication dated November 21, 1994, recited that Captain Kempker had been informed of trouble between appellant and two other inmates. The communication stated that one of the inmates told Kempker that appellant "entered his cell and attempted to rape him." Based on this information and the threat of retaliation against appellant, Captain Kempker placed appellant on Temporary Administrative Segregation Confinement (TASC) for investigation of "Rule # 7—Forcible Sexual Misconduct."

The form filed pursuant to appellant's placement on TASC was marked to indicate the grounds upon which appellant was confined. Three criteria for confinement were marked: inmate is an immediate security risk, inmate is violent or creating a sufficient disturbance to indicate he is not in control, and an urgent need exists to separate inmate from others for his safety or the safety of others. In the statement of facts portion, a pre-printed line states "Conduct Violation for Rule Number ——." Added to the line is the notation "# 7 FORCIBLE SEXUAL MISCONDUCT." The blank in front of this line, however, was not checked.

A classification hearing form was completed on November 23, 1994, in which a summary of the hearing section included the line "11–19–94 rule 7 Forcible sexual misconduct." Also in that section, were the words

"no violation written." The classification hearing resulted in appellant's confinement. A second classification hearing form was completed on December 21, 1994. In this form, the summary section recites that appellant was assigned to administrative segregation for "RULE 7." The section also indicates "no violation" and "no violation since last review."

Appellant's first argument is that the state should not have been allowed to ask questions that implied that appellant had been "found guilty" of a conduct violation when, appellant argues, the record shows otherwise. He argues that "the false testimony" could have affected the judgment of the jury. Appellant principally relies upon cases that relate to the state's introduction of false evidence. *See Napue v. Illinois,* 360 U.S. 264, 269–270, 79 S.Ct. 1173, 1177–78, 3 L.Ed.2d 1217 (1959).

Initially, this Court notes that the cases related to the introduction of false evidence are inapposite to the instant case because the state never introduced any evidence related to appellant's alleged misconduct in prison. Because the state used the prison records only for cross-examination, the relevant law regarding the state's ability to use the records is that relating to cross-examination. *See State v. Selle,* 367 S.W.2d 522, 529 (Mo. 1963) (setting out different rules for proof of commission of crime and for cross-examination of witness); *Conrad,* 719 S.W.2d at 107 (same).

■ The prosecution is authorized to cross-examine a defense witness about alleged prior acts of misconduct on the part of the defendant if the state acts in good faith. *State v. Hastings,* 477 S.W.2d 108, 113 (Mo. 1972); *see Goree,* 762 S.W.2d at 23. The state cannot fabricate allegations or rely on alleged acts that are known never to have occurred. *See Hastings,* 477 S.W.2d at 113. If the state has a good faith basis for asking about past misconduct, then the state can properly cross-examine a witness about the alleged misconduct. *See Goree,* 762 S.W.2d at 23. A court will not presume that the prosecution acted in bad faith. *State v. Terry,* 928 S.W.2d 879, 883 (Mo.App.1996).

■ Contrary to appellant's assertion, appellant's prison records, read in their entirety, establish that the state acted in good faith in cross-examining Dr. Engum. The records reflect that appellant was accused of attempting to sexually assault another inmate and was placed in administrative segregation based on that incident. Although the records reveal no official finding that appellant committed the attack, they also fail to show that he was exonerated of it. Put another way, the records suggest that no ultimate finding was made on the issue. What is undisputed, however, is the fact that appellant's segregation for over a month was premised solely on the occurrence of that attack and the threat of retaliation for it. In light of the record as a whole, the state had a good faith basis to cross-examine Dr. Engum about the appellant's alleged assault on a fellow inmate. *See Goree,* 762 S.W.2d at 23 (finding cross-examination proper because document supported prosecutor's questions); *see also Terry,* 928 S.W.2d at 884 (refusing to find prosecutorial bad faith based on erroneous interpretation of documents due to ambiguity therein).

■ Appellant's next argument is that the state violated its duty to disclose the allegedly exculpatory prison records to the defense. The authority upon which appellant principally relies under this subpoint is *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). This Court will analyze the subpoint, therefore, as a *Bagley* claim.

■ Appellant's claim that the state had a duty to disclose appellant's allegedly exculpatory prison records under *Bagley* fails for several reasons. First, the records related to appellant's segregation in prison while he was awaiting trial were known to appellant and were as equally accessible to the defense as to the prosecution. These records were completed in appellant's presence; in fact, he signed some of them. The prosecution has no obligation to disclose evidence of which the defense is already aware and which the defense can acquire. *See State v. Sykes,* 628 S.W.2d 653, 656 (Mo.1982).

Second, the duty to disclose documents extends only to those documents that are material. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). Evidence is material if there is a reasonable probability that the outcome of the proceedings would have been different if the evidence had been disclosed to the defense. *Bagley,* 473 U.S. at 676, 105 S.Ct. at 3380–81. In this case, the prison records to which appellant refers would serve, at best, merely to rebut the state's effort to impeach a defense expert's testimony. Even if such evidence had been disclosed, no reasonable probability exists that the defense's use of it would have changed the outcome of the punishment phase of this trial. Considering the limited use of the documents to the defense and the otherwise substantial evidence supporting the imposition of the death penalty in this case, the state's failure to disclose appellant's prison records does not undermine confidence in the outcome of the punishment phase of appellant's trial. *See State v. Weaver,* 912 S.W.2d 499, 515 (Mo. banc 1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 153, 136 L.Ed.2d 98 (1996).

Appellant's point is denied.[3]

## VI.

Appellant asserts that the trial court erred in four respects in overruling his motion to strike the aggravating circumstance instruction, Instruction No. 18, submitted by the state in the penalty phase.

Instruction No. 18, patterned after MAI–CR3d 313.40, was accepted by the court and submitted to the jury as follows:

In determining the punishment to be assessed under Count I against the defen-dant for the murder of Cassidy Senter, you must first unanimously determine whether one or more of the following statutory aggravating circumstances exist:

1. Whether the defendant was convicted of robbery first degree on October 22, 1985, in the Circuit Court of the City of St. Louis of the State of Missouri.

2. Whether the murder of Cassidy Senter involved torture and depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find:

1. That the defendant committed repeated and excessive acts of physical abuse upon Cassidy Senter and the killing was therefore unreasonably brutal; and

2. That the defendant's selection of the person he killed was random and without regard to the victim's identity and that defendant's killing of Cassidy Senter thereby exhibited a callous disregard for the sanctity of all human life.

3. Whether the murder of Cassidy Senter was committed while the defendant was engaged in the perpetration of kidnapping.

4. Whether the murder of Cassidy Senter was committed after the defendant had engaged in the perpetration of attempted rape of Cassidy Senter.

You are further instructed that the burden rests upon the state to prove at least one of the foregoing circumstances beyond a reasonable doubt. On each circumstance that you find beyond a reasonable doubt, all twelve of you must agree as to the existence of that circumstance.

---

**3.** Throughout his argument on Point V, appellant complains about the prosecutor's "testifying" about appellant's alleged misconduct in prison. Appellant's complaints implicate the rules that "it is improper to propound hypothetical questions which assume supposed facts" and " '[c]ross-examination should not be permitted to covertly convey to the minds of jurors suspicion and prejudice as to a defendant by a recital as facts of supposed matters not appearing in evidence and wholly outside of the case.' " *Selle,* 367 S.W.2d at 530 (quoting *Pittman v. United States,* 42 F.2d 793, 797 (8th Cir.1930)). This ground for error, however, was not stated in appellant's point relied on. Rule 84.04(d). Consequently, this Court need not address it. *See Thummel v. King,* 570 S.W.2d 679, 685–690 (Mo. banc 1978). Assuming, however, that the form of the prosecutor's cross-examination was improper, appellant was not prejudiced by the court's failure to sustain appellant's objections. The prosecutor was entitled to question Dr. Engum about the alleged sexual assault. In view of the weight of the evidence supporting the jury's imposition of punishment, any erroneous "testimony" regarding appellant's alleged misconduct in prison did not result in prejudice.

Therefore, if you do not unanimously find from the evidence beyond a reasonable doubt that at least one of the foregoing statutory aggravating circumstances exist, you must return a verdict fixing the punishment of the defendant at imprisonment for life by the Department of Corrections without eligibility for probation or parole.

The jury found the existence of all four of the statutory aggravating circumstances.

Appellant complains that robbery is not an assaultive crime; therefore, robbery could not be submitted under section 565.032(2)(1) as an assaultive criminal conviction. Appellant's argument disregards that first degree robbery is defined in part as a robbery that causes serious physical injury to any person or that involves a "deadly weapon" or a "dangerous instrument." Section 569.020.1. *See State v. Amrine*, 741 S.W.2d 665, 672 (Mo. banc 1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988).

■ Appellant asserts that the two limiting constructions for depravity of mind should not have been submitted. Subpart one of the second aggravating circumstance contained in Instruction No. 18 was that the defendant committed repeated and excessive acts of physical abuse upon Cassidy Senter and the killing was therefore unreasonably brutal. Appellant claims that this subfactor was not supported by the evidence. Appellant is incorrect. Cassidy Senter, after appellant tried to rape her, was repeatedly beaten by appellant with a board. The evidence demonstrates that she attempted to defend herself. The evidence, recited more fully in the portion of this opinion that delineates the details of the crime, was sufficient to support a finding that appellant's conduct was extremely brutal and involved serious physical abuse of Cassidy Senter.

■ Appellant complains also of subparagraph two. He alleges that the factor "that the defendant's selection of the person he killed was random and without regard to the victim's identity ..." does not narrow the aggravating circumstance sufficiently for the jury. Appellant's claim in this respect is also without foundation. The construction nar-

rows the depravity of mind aggravating circumstance to those murders that involve an absence of any substantive motive. *See State v. Preston*, 673 S.W.2d 1, 11 (Mo. banc), *cert. denied*, 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984); *see also State v. Griffin*, 756 S.W.2d 475, 489–90 (Mo. banc 1988), *cert. denied*, 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989); MAI–CR 3d 313.40, Notes on Use 7.

■ The fourth aggravating circumstance submitted to the jury required the jury to find whether the murder of Cassidy Senter was committed after the defendant had engaged in the perpetration of attempted rape of Cassidy Senter. Appellant asserts that the wording of the instruction deviates from the wording set forth in section 565.032(2)(11), which requires that the murder be committed "while" the defendant was engaged in certain felony offenses. The deviation, appellant reasons, renders the circumstance a non-statutory aggravating circumstance, rather than a statutory aggravating circumstance.

■ The foregoing allegation of error was not made at trial; therefore, it is not preserved. At the same time, however, the giving of an instruction in violation of the MAI–CR is error, the prejudicial effect of which must be judicially determined. *State v. Isa*, 850 S.W.2d 876, 902 (Mo. banc 1993). There is no prejudice here; the crimes were committed in a continuing course of conduct, and the jury specifically found that the murder occurred during attempted rape.

Appellant concludes his argument on this point by calling to this Court's attention the fact that section 565.030(3)(4), RSMo 1993, specifically directs the jury to weigh aggravating and mitigating evidence. He claims that Instruction No. 20 told the jurors that they were to weigh the aggravating and mitigating circumstances in the case. He contends that since the jury was instructed to weigh factors that were invalid as aggravating circumstances, the verdict was unguided and based on arbitrariness.

■ Because all of the aggravating circumstances submitted to the jury were valid, appellant's point lacks merit. Further-

more, Missouri is a non-weighing state. *Sidebottom v. Delo,* 46 F.3d 744 (8th Cir.), *cert. denied,* 516 U.S. 849, 116 S.Ct. 144, 133 L.Ed.2d 90 (1995); *LaRette v. Delo,* 44 F.3d 681, 687 n. 4 (8th Cir.), *cert. denied,* 516 U.S. 894, 116 S.Ct. 246, 133 L.Ed.2d 172 (1995). This Court has stated repeatedly that only one valid statutory aggravating circumstance need exist. *Weaver,* 912 S.W.2d at 522. The Missouri scheme provides that jurors are not required to make a written finding of any mitigating circumstances and that jurors have discretion to impose a life sentence irrespective of whether the aggravating evidence outweighs the mitigating evidence. *See State v. Petary,* 790 S.W.2d 243, 245–46 (Mo. banc), *cert. denied,* 498 U.S. 973, 111 S.Ct. 443, 112 L.Ed.2d 426 (1990); *see also Zant v. Stephens,* 462 U.S. 862, 870–72, 103 S.Ct. 2733, 2739–40, 77 L.Ed.2d 235 (1983); *State v. Shaw,* 636 S.W.2d 667, 675 (Mo. banc), *cert. denied,* 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982).[4]

## VII.

Appellant contends that the trial court erred in refusing to grant an evidentiary hearing on his Rule 29.15 motion for postconviction relief because both his pro se and amended motions pleaded facts that, if proven, would entitle him to relief.

■ An evidentiary hearing is not required where "the motion and the files and record of the case conclusively show that movant is entitled to no relief." Rule 29.15(g) (1988). The Rule 29.15 motion must be substantially in the form provided by Form 40. Rule 29.15(b) (1988). Once counsel is appointed, if the motion does not assert sufficient facts, counsel shall file an amended motion that sufficiently alleges the additional facts and grounds. Rule 29.15(e). No evidentiary hearing will be required unless the motion meets three requirements: (1) the motion must allege facts, not conclusions,

warranting relief; (2) the facts alleged must raise matters not refuted by the files and records in the case; and (3) the matters of which movant complains must have resulted in prejudice. *State v. Starks,* 856 S.W.2d 334, 336 (Mo. banc 1993). With respect to claims related to ineffective assistance of counsel, to obtain an evidentiary hearing, the movant must allege facts, not refuted by the record, showing that counsel's performance did not conform to the degree of skill, care, and diligence of a reasonably competent attorney and that movant was thereby prejudiced. *See Hill v. Lockhart,* 474 U.S. 52, 60, 106 S.Ct. 366, 371, 88 L.Ed.2d 203 (1985); *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Because none of appellant's allegations satisfies the standards set forth above, his motion was properly overruled without an evidentiary hearing.

### A.

■ In his pro se motion, appellant asserted that counsel did not call his mother as a witness. He alleged that his mother would have told the jury that he was abused as a child. Appellant claims the trial court's finding that his allegation was insufficient on its face was clearly erroneous. Appellant also claims that the trial court's finding that the mother's testimony would have been merely cumulative to testimony at trial was clearly erroneous because the motion court did not know what the testimony would be or how it would be used.

■ An evidentiary hearing is not a means by which to provide movant with an opportunity to produce facts not alleged in the motion. *White v. State,* 939 S.W.2d 887, 904 (Mo. banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 365, 139 L.Ed.2d 284 (1997). Appellant failed in his motion to allege that his mother was available to testify and that counsel was aware of the witness and her

---

**4.** The state properly observes that definitions of "rape" and "attempt" and "substantial step" should have been included in Instruction No. 18. MAI–CR 3d, Notes on Use 8. (Both the third and fourth aggravating circumstances were submitted without a definition of the underlying felony of kidnapping or attempted rape as required by MAI–CR 3d 313.40.) Appellant could

not have suffered manifest injustice, however, because the jury had already determined these elements beyond a reasonable doubt, having deliberated and found appellant guilty of both kidnapping and attempted rape—all elements of which were properly set forth and defined in the guilt phase instructions.

testimony. Appearing to admit the deficiency in his pleading, appellant complains that Form 40, designated by this Court to be used in postconviction relief proceedings, does not provide sufficient room to develop facts. Apart from the obvious problem with appellant's allegation of insufficient space in which to plead, appellant disregards the fact that once counsel is appointed, if the motion fails to assert sufficient facts, counsel is required to file an amended motion that sufficiently alleges the additional facts and grounds. Rule 29.15(e). The claim was not developed in the amended motion. Had the claim been more fully stated, however, this Court notes gratuitously that the motion court did not clearly err in ruling that the testimony would have been cumulative; appellant's grandmother and his aunt testified concerning his relationship with his mother and concerning his abusive childhood. This claim is without merit.

**B.**

Prior to trial, appellant's attorneys moved to submit a jury questionnaire to the venirepersons. The trial court overruled the motion. Appellant asserted in his amended Rule 29.15 motion that trial counsel was ineffective for failing to submit a sample questionnaire along with his motion before the trial court and for failing to present expert testimony to the effect that venirepersons would answer written questions more truthfully than they would answer questions posed orally. The motion court found that appellant failed to submit a sample questionnaire with the amended Rule 29.15 motion or to suggest that the trial court's ruling would have been different had a questionnaire been submitted. The motion court further found that trial counsel had preserved the issue, that it was a proper subject for direct appeal, and that the claim was not cognizable in the postconviction proceeding.

■ The motion court did not clearly err. There is no constitutional right to submission of written questions to the venire panel. The "facts" appellant alleges constitute mere speculation that the voir dire proceedings did not provide appellant sufficient latitude to inquire of the venire panel and to select and to disqualify potential jurors. His argument fails.

**C.**

Appellant's amended motion alleged that trial counsel was ineffective for failing to investigate appellant's mental health for purposes of mitigation evidence in the penalty phase and that counsel was ineffective for failing to obtain one or more mental health professionals who could have performed a battery of psychological tests and might have testified to some mental disease or defect that would have negated appellant's guilt, found him incompetent to go to trial, reflected inability to deliberate, or persuaded the jury that life in prison was the appropriate punishment.

The motion court made exhaustive findings and conclusions. Appellant nevertheless takes issue with the motion court's finding that the jury was made aware of appellant's home life, character, and the abuse he suffered while growing up and that the evidence was sufficient to have the court submit each mitigating circumstance requested by appellant. Appellant contends that the mitigation evidence that he would submit to a jury is more than that which would support a mitigating circumstance. He points out that any evidence may be considered by the trier of fact.

■ The motion court did not clearly err. Appellant's claims were entirely conclusional. They were, as the motion court put it, "barren of the proposed substance of any testimony." In addition, the allegation in the amended motion that one or more of the mental health professionals or others with similar education and training would have diagnosed a mental problem and presented this to the jury fails to allege facts sufficient to warrant an evidentiary hearing. *See State v. Harris,* 870 S.W.2d 798, 815 (Mo. banc), *cert. denied,* 513 U.S. 953, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994).

In connection with this claim, appellant seeks on appeal to argue facts contained in a "Motion for Reconsideration" filed by motion counsel. The motion covers more than five hundred pages in the motion legal file pre-

sented to this Court. The motion contains affidavits and other materials and alleges what the movant claims to be facts.

The motion for reconsideration was not properly before the motion court and it is not properly before this Court. It was filed more than five months after the amended motion was filed. The Rule 29.15 motion is subject to requirements of timely filing and limitations on amendments. Rule 29.15(b),(f) (1988). The trial court is without authority to give additional time beyond that provided by Rule 29.15(f). *State v. Six,* 805 S.W.2d 159, 170 (Mo. banc), *cert. denied,* 502 U.S. 871, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991). Supplementary Rule 29.15 pleadings that are filed outside of the valid and mandatory time limits will not be reviewed. *See Weaver,* 912 S.W.2d at 520.

### D.

In his amended motion, appellant alleged that trial counsel was ineffective for failing to assert that the St. Louis County prosecuting attorney purposefully discriminates against African–American persons who kill white persons, in violation of the Fourteenth Amendment of the United States Constitution and art. I, section 2, of the Missouri Constitution. Appellant points to statistical evaluations of the charging practices in St. Louis County, and other jurisdictions, to demonstrate what he believes is systematic discrimination in St. Louis County and in the state of Missouri. He alleges as proof of discrimination that he is African–American, that the victim was white, and that the prosecuting attorney refused to take a negotiated plea for life.

Appellant's allegation of motion court error must fail. He does not allege any facts that pertain to the prosecutor's alleged discrimination in his own case. To prevail, a defendant must offer clear proof of discrimination in his own case. Recently, this Court confronted a similar claim in *State v. Taylor,* 929 S.W.2d 209, 221 (Mo. banc 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1088, 137 L.Ed.2d 222 (1997):

A prosecutor's broad discretion does not extend to decisions deliberately based on unjustifiable standards such as race or some other entirely arbitrary factor. *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985). To show an equal protection violation, [defendant] must prove both the prosecutor's decision had a discriminatory effect on him and it was motivated by discriminatory purpose. *Id.* 'Because discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused.' *McCleskey v. Kemp,* 481 U.S. 279, 297, 107 S.Ct. 1756, 1770, 95 L.Ed.2d 262 (1987).

Only one of [defendant]'s allegations pertains to decisions made in his case. The Jackson County and Missouri studies, assuming *arguendo* they are valid and reliable, apply to discriminatory effect of decisions, but do no show purposeful discrimination or any effect on his case, specifically. 'To prevail under the Equal Protection Clause [defendant] must prove that the decisionmakers in *his* case acted with discriminatory purpose.' *Id.* at 292, 107 S.Ct. at 1767 (emphasis in original).

\* \* \* \* \* \*

The allegation of discrimination specific to this case is the prosecutor's refusal to exchange a recommendation of life without parole for [defendant]'s guilty plea to first degree murder. [Defendant] charges the race of defendant and victim must be the reason for the prosecutor's decision. More likely, the unique circumstances of [the victim]'s murder and the strength of the State's case motivated the prosecutor's decision. 'Where the discretion that is fundamental to our criminal process is involved, we decline to assume that what is unexplained is invidious.' *Id.* at 313, 107 S.Ct. at 1778.

The particular facts of this case and the overwhelming evidence against appellant, much of which is recited elsewhere in this opinion, reflect that it is highly likely that the nature of the murder of ten-year-old Cassidy Senter and the strength of the state's case motivated the prosecutor's decision to seek the death penalty, free from any discrimina-

tory purpose. The argument is without merit.

### E.

Appellant contended in his amended motion that the state had in its possession material, exculpatory evidence that the state failed to turn over to the defense. He sought to establish a claim of violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Appellant's claim is patently frivolous. It is entirely speculative and conclusional. There is no authority in law for the proposition that a defendant may simply make a general allegation of a *Brady* violation so as to require the motion court to grant an evidentiary hearing and to order that the state disclose its entire file so that a criminal defendant may cast about, attempting to discover whether or not a *Brady* violation may have occurred. Appellant's claim requires no further discussion.

### F.

Appellant contends that the motion court clearly erred in denying his postconviction relief motion claims of ineffective assistance of counsel for failing to object to various issues during the guilt phase of the trial. Appellant's amended motion contained over fourteen pages alleging a multitude of instances in which trial counsel failed to object during the guilt phase of trial, a substantial number of which addressed instances where the prosecutor was alleged to have led the witnesses.

The motion court found no prejudice, found that not one of the suggested objections concerned evidence that directly incriminated movant, and noted the nature of the defense, a denial of deliberation to constitute first degree murder. The motion court found that the claims either did not allege prejudice or were not outcome determinative.

Appellant argues that the trial court failed to apply the test of "totality" regarding counsel's performance. Even though an individual allegation of ineffective assistance might not rise to the level of a due process violation, he contends, the cumulative effect of all of counsel's errors can rise to the level of a denial of due process.

Review of the numerous claims of ineffective assistance in this regard reveals that the motion court's findings and conclusions are not clearly erroneous. It is notable that appellant does not argue with the motion court's finding that none of the claims in and of itself alleges sufficient prejudice. His argument on appeal consists simply of the "totality" test. His argument on appeal is deficient in the same manner as his pleading below. If counsel's conduct is not constitutionally ineffective in any individual instance, counsel cannot be held ineffective on the whole. *See State v. Whitfield*, 939 S.W.2d 361, 372 (Mo. banc), *cert. denied*, — U.S. ——, 118 S.Ct. 97, 139 L.Ed.2d 52 (1997). The motion court's ruling was not clearly erroneous.

### G.

Appellant alleged in his amended motion that the penalty phase jury instructions were unconstitutional because jurors do not understand the instructions. He says on appeal that he was prepared to offer testimony on this issue at the postconviction hearing. Claims of instructional error are claims properly raised on direct appeal, not in postconviction proceedings, *State v. Brown*, 902 S.W.2d 278, 295 (Mo. banc), *cert. denied*, 516 U.S. 1031, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995). Appellant's point is denied.

### VIII.

Appellant alleges that the trial court abused its discretion in admitting certain photographs of the crime scene and morgue photographs of the victim because they were gruesome, cumulative, and unduly inflammatory and because their prejudicial effect outweighed their probative value. The photographs are identified by exhibit numbers. Two of them, exhibits 75 and 81, were not introduced or admitted at trial. As a consequence, this Court will address only state's exhibits 59, 62–64, photographs of the body at the site where the body was discovered, and exhibits 70–74, together with 76–79, autopsy photographs.

The trial court is vested with broad discretion in the admission of photo-

graphs. *State v. McMillin*, 783 S.W.2d 82, 101 (Mo. banc), *cert. denied*, 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990). Photographs are relevant if they show the scene of the crime, the identity of the victim, the nature and extent of the wounds, the cause of death, or otherwise assist the jury in understanding the testimony or help in proving an element of the crime. *See State v. Feltrop*, 803 S.W.2d, 1, 10–11 (Mo. banc), *cert. denied*, 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). "A photograph is not rendered inadmissible because other evidence may have described what is shown in the photograph; nor is the state precluded from introducing a photograph because the defendant expresses a willingness to stipulate to some of the issues involved." *State v. Schneider*, 736 S.W.2d 392, 403 (Mo. banc 1987), *cert. denied*, 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 871 (1988). "If a photograph is relevant, it should not be excluded because it may be inflammatory, unless the situation is so unusual that the extent of the prejudice outweighs the photograph's probative value." *State v. Murray*, 744 S.W.2d 762, 772 (Mo. banc), *cert. denied*, 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988).

 The record reflects that the experienced trial court carefully examined the state's photographic evidence and limited the use of photographs that might be cumulative or repetitive. State's exhibits 62 through 64 assisted in demonstrating to the jury facts with respect to how the victim's clothing was found on her body, which is relevant to establish the elements of the crime of attempted rape. The exhibits also helped to explain the testimony with respect to discovery of appellant's pubic hair on the victim's jeans. State's exhibits 70–74 and 76–80, autopsy photographs, display different wounds inflicted upon the victim. In addition, the photographs were relevant to establish the element of deliberation, an issue appellant contested at trial. The types of wounds Cassidy Senter suffered and the appearance of her body when found are relevant to establishing deliberation. *State v. Storey*, 901 S.W.2d 886, 895 (Mo. banc 1995). The photographs were relevant in the penalty phase, as well, to show that the victim died of repeated and excessive acts of physical abuse and that the killing was unreasonably brutal, an aggravating circumstance that the jury found to exist.

 Appellant's complaint about exhibit 59 is that it shows again the position and condition of the victim's body, which was already before the jury by admission of exhibit 58. Appellant appears to be claiming that admission of exhibit 59 was erroneous because it was cumulative, unnecessary. Even if an additional photograph of the position and the condition of the victim's body may have been unnecessary, this Court cannot say that the admission of the exhibit was prejudicial. The trial court did not abuse its discretion in admitting any of the photographs in question; they are relevant, and their probative value outweighs any prejudicial effect.

In connection with this point, appellant appears to attack the foundation for the admission of state's exhibits 70–74 and 76–80. Appellant's failure to preserve the issue defeats his claim on appeal, and, in any event, there is no error.

## IX.

Under section 565.035.3, RSMo 1994, this Court is required to review the sentence of death.

Appellant asserts that the death verdict in this case was imposed as a result of the passion and prejudice that was engendered through Rhonda Senter's outburst in the courtroom and by the bailiffs' handcuffing of appellant when the guilty verdict was returned. Appellant's contentions are without merit, as discussed above. The death sentence in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

The record also reflects that the four statutory aggravating circumstances found by the jury are supported by the evidence.

Appellant asserts that the proportionality review undertaken by this Court as required by section 565.035.3(3) and .5 is inadequate because this Court fails to consider all similar cases and reviews only those cases that resulted in the death penalty and because

this Court does not engage in a "frequency approach."

■ Appellant's claims and those similar to his have been repeatedly rejected both because proportionality review is not constitutionally required and because this Court's practices do not violate rights to due process. *See State v. Carter*, 955 S.W.2d 548, 561 (Mo. banc 1997); *State v. Simmons*, 944 S.W.2d 165, 190 (Mo. banc), *cert. denied*, —— U.S. ——, 118 S.Ct. 376, 139 L.Ed.2d 293 (1997); *State v. Basile*, 942 S.W.2d 342, 361 (Mo. banc), *cert. denied*, —— U.S. ——, 118 S.Ct. 213, 139 L.Ed.2d 148 (1997); *Taylor*, 929 S.W.2d at 223; *Weaver*, 912 S.W.2d at 522; *Ramsey*, 864 S.W.2d at 327–28; *State v. Whitfield*, 837 S.W.2d 503, 514–15 (Mo. banc 1992); *State v. Schneider*, 736 S.W.2d at 398.

■ Appellant alleges that this Court's proportionality review fails because the court has "refused" to compare cases in which the state chose not to charge the defendant with capital murder, the state agreed to a plea bargain whereby a defendant pled guilty to a lesser charge, the defendant was convicted for an offense less than capital murder, or the state waived the death penalty.

The pertinent statute does not require this Court to include such cases in its proportionality review. Cases resulting in convictions for charges less than first degree murder are not cases in which the "sentence of death or life imprisonment without probation or parole was imposed...." Section 565.035.6. Cases in which the death penalty is waived are cases in which the sentencing authority has no discretion; therefore, there can be no arbitrary and capricious sentencing in such cases. They are not similar cases because the focus of such cases is the prosecutor's exercise of discretion, not the sentencing authority's choice between life or death.

■ Proportionality review is not constitutionally required. It is designed as an additional safeguard against arbitrary and capricious sentencing and to promote the evenhanded, rational, and consistent imposition of death sentences. *Ramsey*, 864 S.W.2d at 328. That this Court construes Missouri's statute in a different manner from that urged by appellant does not result in a federal constitutional violation. Furthermore, counsel's argument on behalf of appellant in this respect fails to cite applicable and available authority contrary to the position urged in his brief. Counsel has an obligation to cite all relevant authority, including authority contrary to his position.

■ The sentence of death in this case is not excessive or disproportionate to the penalty imposed in similar cases, considering the crime, the strength of the evidence, and the defendant. Appellant's crime consisted of kidnapping Cassidy Senter, a ten-year-old child, attempting to rape her, and, in the course of that, abusing and seriously injuring her before murdering her. The child attempted to fend off the repeated, deadly blows from the wooden bed slat that appellant used to beat her head. He left her body to decompose behind a freezer in his sister's basement. Ultimately, appellant dumped her body in an alley. Similar cases include *State v. Taylor*, 929 S.W.2d 209 (Mo. banc 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1088, 137 L.Ed.2d 222 (1997); *State v. Kreutzer*, 928 S.W.2d 854 (Mo. banc 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 752, 136 L.Ed.2d 689 (1997); *State v. Nunley*, 923 S.W.2d 911 (Mo. banc 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 772, 136 L.Ed.2d 717 (1997); *State v. Brown*, 902 S.W.2d 278 (Mo. banc), *cert. denied*, 516 U.S. 1031, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995); *State v. Lingar*, 726 S.W.2d 728 (Mo. banc), *cert. denied*, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987); and *State v. Mercer*, 618 S.W.2d 1 (Mo. banc), *cert. denied*, 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981), in which sentences of death were imposed.

The evidence against appellant was strong—he admitted killing Cassidy. This Court has affirmed sentences of death where the defendant had a history of prior convictions for serious assaultive crimes. *See State v. Chambers*, 891 S.W.2d 93 (Mo. banc 1994); *State v. Reuscher*, 827 S.W.2d 710 (Mo. banc), *cert. denied*, 506 U.S. 837, 113 S.Ct. 114, 121 L.Ed.2d 71 (1992); *State v. Sidebottom*, 753 S.W.2d 915 (Mo. banc), *cert. denied*, 488 U.S. 975, 109 S.Ct. 515, 102 L.Ed.2d 550 (1988); *State v. Parkus*, 753 S.W.2d 881 (Mo.

banc), *cert. denied,* 488 U.S. 900, 109 S.Ct. 248, 102 L.Ed.2d 237 (1988).

Although appellant suffered an extremely difficult childhood, the jury's recommendation and the court's imposition of the sentence of death in this case were not disproportionate under all the facts and circumstances presented at trial.

## X.

The judgments are affirmed.

All concur.