Eric WEBB, Appellant,

v.

STATE of Missouri, Respondent.

No. SC 91012.

Supreme Court of Missouri,
En Banc.

March 29, 2011.

Ellen H. Flottman, Public Defender's Office, Columbia, for Webb.

John W. Grantham, Attorney General's Office, Jefferson City, for the State.

PER CURIAM.

### Introduction

Eric Webb, an intoxicated driver who pleaded guilty to first-degree involuntary

manslaughter and armed criminal action, alleges that he did not receive effective representation when he pleaded guilty because his attorney misled him by telling him that he would not be subject to the law requiring him to serve 85 percent of his sentence in prison on the manslaughter conviction before becoming eligible for parole.

This Court has held that the failure to inform a client about parole eligibility does not render the attorney's representation ineffective but has indicated that a plea may be considered involuntary if counsel misinforms the client as to the effects of the plea. *Reynolds v. State*, 994 S.W.2d 944, 946 (Mo. banc 1999). The court of appeals has observed this distinction based on *Reynolds* by holding that counsel's misinformation renders the representation ineffective. This Court now adopts this distinction and holds that where counsel misinforms the client as to the effects of the client's plea, the counsel has rendered ineffective representation. Webb, therefore, is entitled to an evidentiary hearing.

### Facts and Procedural History

Eric Webb, driving a Jeep under the influence of alcohol, collided with a truck, killing Terry Parker, an occupant of the truck. Webb was indicted as a persistent offender with one count of the class B felony of first-degree involuntary manslaughter, one count of armed criminal action and one count of failure to drive on the right half of the roadway.

When Webb appeared at a June 2008 plea hearing, the prosecutor told the court that the state was dropping the charge for failure to drive on the right half of the roadway in exchange for Webb's guilty pleas to the other two charges. In exchange for Webb's guilty pleas, the prose-cutor recommended that Webb receive two 10–year sentences to run concurrently.

Webb's guilty pleas admitted that in April 2007, while he was driving under the influence of alcohol, he drove on the wrong side of the road with criminal negligence and collided with a vehicle in which Terry Parker was an occupant, causing Parker's death. He also admitted that he committed the crime of involuntary manslaughter through the use of a dangerous instrument, an automobile. He then entered guilty pleas to one count of first-degree involuntary manslaughter and one count of armed criminal action.

After he pleaded guilty, the court asked Webb a series of questions, to which Webb responded that (1) no one had threatened him or promised him anything to get him to plead guilty, (2) he understood he was waiving all of his rights at trial and (3) he understood the range of punishment available for both counts. Webb also said that his attorneys had not made him plead guilty against his free will, that his attorneys could not have done anything differently in handling his case and that he was satisfied with their legal services. The court found that Webb's pleas were voluntary, knowing and intelligent but deferred acceptance of his pleas until the court could see the sentencing assessment report (SAR) that it was ordering under section 217.760.[1]

Webb appeared again in July 2008 for sentencing. Webb's attorney acknowledged that she had reviewed the SAR and had discussed it with Webb. The court informed Webb that, based on the SAR, it intended to reject the plea agreement and sentence Webb to a 12–year term of imprisonment rather than a 10–year term. Webb was given the opportunity to withdraw his plea but chose to maintain it and

---

1. All statutory citations are to RSMo Supp. 2007, unless otherwise indicated.

accept the 12–year sentence. The court then sentenced Webb to 12 years of imprisonment on each count to run concurrent with one another and concurrent with a prior sentence that Webb already was serving. Though indicted as a persistent offender, Webb was not sentenced as a persistent offender.

Webb timely filed a *pro se* motion for post-conviction relief. The court appointed post-conviction counsel, who filed an amended Rule 24.035 motion. The motion alleged, in part, that Webb's guilty plea was involuntary and unknowing because he was denied the right to effective assistance of counsel. Webb's motion alleged that his counsel told him that, as a result of his guilty plea, he would not be subject to any "85 [percent] non-parole eligibility rule" but that he would be required to serve 40 percent of his sentence without parole eligibility. Webb alleged that, but for his attorney's misrepresentation, he would have rejected pleading guilty and, instead, would have insisted on proceeding to trial. He also argued that because the 85–percent rule was contained in the statute, it was a direct consequence of his plea, and the sentencing court should have informed him of this consequence.

The motion court entered written findings of fact and conclusions of law and a judgment overruling Webb's motion without an evidentiary hearing. After opinion in the court of appeals, this Court granted transfer and has jurisdiction. Mo. CONST. art. V, sec. 10.

## Standard of Review for Rule 24.035 Motion

This Court's review of the overruling of a Rule 24.035 motion is limited to a determination of whether the motion court's

findings and conclusions are clearly erroneous. Rule 24.035(k); *Feldhaus v. State,* 311 S.W.3d 802, 804 (Mo. banc 2010).

A movant only is entitled to an evidentiary hearing if (1) the movant pleaded facts, not conclusions, warranting relief; (2) the facts alleged are not refuted by the record; and (3) the matters complained of resulted in prejudice to the movant. *Matthews v. State,* 175 S.W.3d 110, 113 (Mo. banc 2005). When the requested evidentiary hearing involves a claim of ineffective assistance of counsel, the movant must allege facts, unrefuted by the record, that (1) trial counsel's performance did not conform to the degree of skill, care and diligence of a reasonably competent attorney and (2) he was thereby prejudiced. *Id.* To satisfy the "prejudice" requirement when challenging a guilty plea, the movant must allege facts showing " 'that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.' " *Coates v. State,* 939 S.W.2d 912, 914 (Mo. banc 1997) (quoting *Hill v. Lockhart,* 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)).

## The Guilty Pleas and Their Consequences

Webb entered guilty pleas to armed criminal action and the class B felony of involuntary manslaughter. Under section 565.024.2, a defendant who is convicted of involuntary manslaughter as a class B felony must serve a "minimum prison term" of "eighty-five percent of his or her sentence." [2] The statute was amended in 2005 to add the 85–percent requirement.[3] Webb alleged, however, that his attorney advised him that the minimum prison term he would be required to serve was only 40

---

2. *See State v. Seeler,* 316 S.W.3d 920 (Mo. banc 2010), for a discussion of this statute.

3. 2005 Mo. Legis. Serv. 1st Ex.Sess. H.B. 2.

percent of his 12–year sentence. Webb, therefore, alleges that he pleaded guilty believing that the minimum prison term he would serve was 4.8 years of his sentence before becoming eligible for parole. In reality, he is required to serve at least 10.2 years of his sentence before he is eligible for parole.

This Court, as noted, has held that a defendant's plea is not involuntary when a defendant pleads guilty to a crime without knowing that the crime carries a mandatory minimum penalty. *Reynolds*, 994 S.W.2d at 946. The defendant in *Reynolds* was not informed that he would have to serve 80 percent of his sentence before becoming eligible for parole. *Id.* at 945. He filed a Rule 24.035 motion arguing that his plea was involuntary because he was not informed of this consequence of his plea. *Id.* at 946. This Court held that, to enter a voluntary and intelligent plea, the defendant is required only to have knowledge of the direct consequences of his plea. *Id.* (citing *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)). Eligibility for parole, the Court said, is merely a "collateral" consequence of a defendant's plea, and, therefore, "neither counsel nor the trial court is under an affirmative obligation to inform a defendant of the parole consequences of the guilty plea." *Reynolds*, 994 S.W.2d at 946 (citing *Hill*, 474 U.S. at 56, 106 S.Ct. 366). The Court noted, however, that misinforming—in contrast to failing to inform—may affect the voluntariness of a defendant's plea. *Reynolds*, 994 S.W.2d at 946.[4]

Since *Reynolds*, the court of appeals has drawn a distinction between misinformation and failure to inform. In *Hao v. State*, the eastern district of the court of appeals held that the defendant had pleaded sufficient facts to entitle him to an evidentiary hearing where the defendant was required to serve one-third of his sentence, but his attorney allegedly had informed him erroneously that he would be eligible for parole after serving only 15 percent of his sentence. *Hao v. State*, 67 S.W.3d 661 (Mo.App.2002). Similarly, in *Patterson v. State*, the western district of the court of appeals cited *Hao* with approval and held that "[a]n evidentiary hearing was necessary to determine whether counsel's incorrect advice about the applicability of the eighty-five percent rule 'could have had a prejudicial effect on the voluntariness of the plea.'" *Patterson v. State*, 92 S.W.3d 212, 216 (Mo.App.2002) (quoting *Copas v. State*, 15 S.W.3d 49, 55 (Mo.App.2000)). See also the southern district's opinion in *Fogle v. State*, 124 S.W.3d 509, 511–12 (Mo.App.2004), remanding for an evidentiary hearing where the defendant alleged that counsel misinformed him as to the effect of his sentence on his eligibility for parole.

Further, the court of appeals has held that "[a] negative response to a routine inquiry whether any promise other than stated on the record had been made is too general to encompass all possible statements by counsel to his client." *Shackleford v. State*, 51 S.W.3d 125, 128 (Mo.App. 2001). In such a case, allegations that the defendant's attorney misinformed him as to parole eligibility "are not conclusively refuted by the record [where] no mention

---

4.  The Court said:
    Although there is authority for the proposition that misinforming as opposed to failing to inform a defendant about eligibility for parole may undermine the voluntariness of the plea, ... in this case movant alleges only that he had not been informed, not that he had been misinformed. As such, he has no grounds to contest the plea.
    *Reynolds*, 994 S.W.2d at 946 (internal citations omitted).

is made of parole eligibility." *Id.; Reid v. State,* 192 S.W.3d 727, 733 (Mo.App.2006).

In this case, the motion court held that Webb was not entitled to an evidentiary hearing because he had told the sentencing court that, other than the plea agreement with the state, he had not been *promised* anything to get him to plead guilty. The motion court, therefore, held that Webb's claim that his attorney told him he only would have to serve 40 percent of his sentence was refuted by the record. But an attorney's advice is not the same as a promise—a defendant can say correctly that he was promised nothing, but this does not mean he was given correct advice as to the effects of his plea. Moreover, Webb's response after the plea that he was satisfied with his attorney's services obviously was not made with knowledge that his plea attorney's alleged advice had been incorrect. As noted, a negative response to a routine inquiry has not been considered sufficient to refute the record. *See Shackleford,* 51 S.W.3d at 128; *Reid,* 192 S.W.3d at 733. Under this analysis, the motion court's finding that the record refutes Webb's claim is clearly erroneous.[5]

The state agrees with the preceding analysis but argues Webb's claim nonetheless is refuted by the record because the record shows that Webb reviewed the SAR with his attorney and that the information about parole eligibility is set forth in the SAR. Therefore, the state argues, Webb was informed he would have to serve a minimum prison term of 85 percent of his sentence when he reviewed his SAR with his attorney. The record in this Court at the time of oral argument did not contain the SAR because, the assistant attorney general said, the circuit clerk informed him that the SAR was not part of the court's record and would not be produced. The SAR is not a public document until after the defendant pleads guilty. Section 557.026, RSMo 2000. But, as a document reviewed by the sentencing court, by Webb and by his attorney, it should be part of the record.[6] This Court, after oral

5. The dissent argues that *Peiffer v. State,* 88 S.W.3d 439 (Mo. banc 2002), is controlling. It is not. The defendant in *Peiffer* asserted that he had received ineffective assistance of counsel where his counsel "told him that if he pleaded guilty and received concurrent sentences, his date for earlier release on another sentence would not be affected." *Id.* at 445. Not only did this Court find that the defendant "failed to establish any facts not refuted by the record," it also found that "the motion court's findings were not clearly erroneous." *Id.* at 446. The motion court had found that the defendant's belief that he would receive credit for time served on an earlier case was unreasonable. *Id.* at 445. The motion court also noted that the defendant "failed to allege that his attorney specifically told him he would receive credit in this manner." *Id.*

6. Because the sentencing court considered the SAR, it is part of the circuit court record to be reviewed in post-conviction proceedings. *See* Rule 30.04(a) ("The record on appeal shall contain all of the record, pro-

ceedings, and evidence necessary to the determination of all questions to be presented."); Rule 30.04(h) ("If anything material is omitted from the record on appeal, ... [t]he appellate court may ... order that a supplemental record on appeal be prepared ... by the clerk of the trial court."). In this case, the record reflects that counsel reviewed the SAR with Webb, and the sentencing court reviewed the SAR before rejecting the 10-year plea agreement. This is consistent with the statutes governing presentence investigations, sections 217.760, RSMo Supp.2003; 217.762, RSMo 2000; and 557.026, RSMo 2000, pursuant to which the SAR is prepared. *See also* Rule 29.07(a). Section 559.125, RSMo 2000, allows only the parole board and "the judge entitled to receive [presentence] reports" to view the presentence reports. A defendant or his attorney as well as any "other person having a proper interest therein" may inspect the report at the discretion of the court. Section 559.125.2. Finally, the report shall be made available to the state when "at the discretion

argument, ordered the clerk to send the SAR to this Court under seal, and this Court provided copies to counsel.

The state's argument in this Court assumed that the SAR contained the information about the 85–percent requirement, but in fact Webb's SAR does not contain any language notifying him or his attorney that he would be required to serve at least 85 percent of his sentence.[7] Webb, therefore, is entitled to an evidentiary hearing and may be entitled to relief if he proves the facts he has alleged and establishes that he was prejudiced by relying on misinformation.[8]

## Conclusion

The motion court's judgment is reversed. The case is remanded.

TEITELMAN, WOLFF, BRECKENRIDGE and STITH, JJ., concur.

WOLFF, J., concurs in separate opinion filed.

TEITELMAN and STITH, JJ., concur in opinion of WOLFF, J.

FISCHER, J., dissents in separate opinion filed.

PRICE, C.J., and RUSSELL, J., concur in opinion of FISCHER, J.

MICHAEL A. WOLFF, Judge, concurring.

### Truth *and* Consequences

Was there "truth" in this sentencing? How about accurate information?

There were five persons directly involved—the defendant Eric Webb, his attorney, the probation officer who prepared the sentencing assessment report (SAR), the experienced trial judge and the prosecutor.[1] What might each of these five

of the court," the report's receipt "is in the best interest of the state." Section 559.125.3. Under this statute, any appellate court considering the case below has "a proper interest therein" to view the SAR. It is also in the best interest of the state to allow the appellate court to have access to the SAR. Therefore, in cases such as this, after the plea, the SAR is part of the record, and circuit court clerks are to provide copies of a defendant's SAR upon request to post-conviction and appellate counsel for both the defendant and the state. Because the information in the report is privileged, the SAR is to be entered in the record under seal.

7. Section 565.024 provides that first-degree involuntary manslaughter is a class B felony when a person, driving while intoxicated, acts with criminal negligence and kills a passenger in another car. Section 565.024.1(3)(a). The statute as written leads to some confusion, but it is not vague. *Seeler,* 316 S.W.3d 920. Section 565.024.2 makes a conviction of violating section 565.024.1(3)(a) subject to the 85–percent limitation on parole eligibility. In addition to the statute, this information was available to counsel in the 2007–2008 Users Guide of the Missouri Sentencing Advisory Commission, available at http://www.mosac.mo.gov/file/User% 20Guide% 202007–2008_1.pdf, on page 7, and also was available on the "Automated Recommended Sentencing Information" on the Missouri Sentencing Advisory Commission website, http://www.mosac.mo.gov/page.asp?id=181. There is no reason that appears on Webb's SAR as to why the probation officer who prepared the report did not include the 85–percent requirement.

8. In his brief and at oral argument, Webb argued that he should receive an evidentiary hearing under the United States Supreme Court's recent decision in *Padilla v. Kentucky,* — U.S. ——, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010). It is not necessary to consider whether *Padilla* applies to other consequences such as parole eligibility because Webb is entitled to an evidentiary hearing under Missouri's case law.

1. Also involved, obviously, are the family of the victim and the public, who should have accurate information to determine whether justice is being served. Did the members of the victim's family leave the courtroom believ-

persons have known about the "truth" of this sentencing?

- Webb—he says his attorney told him he would have to serve 40 percent of his sentence in prison before becoming eligible for parole. The truth is that the statute governing his crime requires him to serve 85 percent of his sentence before becoming eligible for parole.
- Webb's attorney—the attorney has not yet testified during post-conviction review about what information was given to Webb. If the information the attorney gave Webb was not true, the attorney did not check the statute or the sentencing information available on the sentencing advisory commission's website.
- The probation officer who prepared the SAR—we now know that the report does not say that Webb is ineligible for parole until he has served 85 percent of his sentence in prison.[2]
- The prosecutor may or may not have known about the 85-percent provision, but the prosecutor surely would say that it is not the prosecutor's job to inform the defendant of the effects of his plea. But if the prosecutor knows, it might be well to say so, if only to avoid post-conviction proceedings like this one.
- The circuit court rejected the 10-year plea agreement after reviewing the SAR. Did the court know that Webb would be required to serve 85 percent of his sentence? In other words, if he had known of this requirement, would he have rejected the 10-year sentence and imposed a 12-year sentence—with Webb required to serve at least 10.2 years of that sentence?

The Missouri criminal code recently was called "a Christmas tree of oddball crimes and penalties."[3] The truth of that observation is obvious in this case, which involved a driver whose negligent and alcohol-impaired conduct resulted in the death of Terry Parker, the driver of the vehicle with which Webb collided. Section 565.024,[4] provides that the first-degree involuntary manslaughter charge in this case can be filed either as a class C felony (maximum prison term of seven years) or a class B felony (maximum prison term of 15 years),[5] or the wrongful act can be charged as any number of lesser felonies or misdemeanors. To charge this crime as a class B felony, the state must allege that the

ing that Webb would serve at least 40 percent of his 12-year term in prison or 85 percent? If the case is reported in the media, what was the public told?

2. The SAR, which does not refer to the 85-percent requirement, contains the parole board's discretionary release guidelines, which call for parole release at 80 percent if the risk-assessment level determined by prison-based factors is the same as the risk level presented at sentencing, and the parole board's data that show that the percentage of time served in fiscal 2007 was 70 percent. Neither figure reflects the nondiscretionary nature of the 85-percent requirement, which was added in 2005. *See* section 565.024, RSMo Supp.2006. The release information may reflect those sentenced before and after the 85-percent restriction was enacted.

3. J. Miles Sweeney, special master, Report of the Special Master: *State ex rel. MSPD v. Hon. Jon Waters and Hon. Mark Orr*, SC91150, Feb. 9, 2011. *See also* Allison Retka, *Missouri public defender special master: To solve the caseload*, Missouri Lawyers Media, Feb. 9, 2011, *available at* http://fmdarticles.com/p/articles/mi_7992/is_20110209/ai_n 56888194/.

4. All statutory references are to RSMo Supp. 2007 unless otherwise specified.

5. *See* section 558.011 for the minimum and maximum terms of imprisonment for each of the felonies. Other sections of chapter 558 provide for certain offenders, such as persistent offenders, to receive enhanced sentences.

defendant, driving while intoxicated, acted with criminal negligence and killed a driver or a passenger *in another car.* Section 565.024.1(3)(a). If the victim had been a passenger *in Webb's car,* the highest level of felony that could be charged is a class C felony.[6] *State v. Seeler,* 316 S.W.3d 920 (Mo. banc 2010).

When a defendant pleads guilty to involuntary manslaughter as set forth in section 565.024.1(3)(a), his prison term is subject to the 85–percent limitation on parole eligibility. Section 565.024.2. Many of the 85–percent limitations in our sentencing laws were enacted, apparently with no irony intended, as "truth in sentencing" provisions.

Given the several crimes with which Webb could have been charged for his driving that caused the death of Terry Parker, there truly was a menu of options available to the local prosecutor. This may lead to the conclusion that our Christmas tree of a criminal code creates not one criminal justice system, but 115—one for each local jurisdiction.

Because these systems have negotiated pleas in the overwhelming number of cases, they can be considered a market, perhaps best understood with an analogy: Think of 115 used-car dealers, whose deals cause many of the buyers (the criminal defendants) to believe they paid too much and—where the crimes have specific victims—ensure that many of the victims or their survivors will believe they were paid too little.[7]

---

6. Section 565.024 in its entirety reads:

   1. A person commits the crime of involuntary manslaughter in the first degree if he or she:
   (1) Recklessly causes the death of another person; or
   (2) While in an intoxicated condition operates a motor vehicle in this state and, when so operating, acts with criminal negligence to cause the death of any person; or
   (3) While in an intoxicated condition operates a motor vehicle in this state, and, when so operating, acts with criminal negligence to:
   (a) Cause the death of any person not a passenger in the vehicle operated by the defendant, including the death of an individual that results from the defendant's vehicle leaving a highway, as defined by section 301.010, RSMo, or the highway's right-of-way; or
   (b) Cause the death of two or more persons; or
   (c) Cause the death of any person while he or she has a blood alcohol content of at least eighteen-hundredths of one percent by weight of alcohol in such person's blood; or
   (4) Operates a motor vehicle in violation of subsection 2 of section 304.022, RSMo, and when so operating, acts with criminal negligence to cause the death of any person authorized to operate an emergency vehicle, as defined in section 304.022, RSMo, while such person is in the performance of official duties.

   2. Involuntary manslaughter in the first degree under subdivision (1) or (2) of subsection 1 of this section is a class C felony. Involuntary manslaughter in the first degree under subdivision (3) of subsection 1 of this section is a class B felony. A second or subsequent violation of subdivision (3) of subsection 1 of this section is a class A felony. For any violation of subdivision (3) of subsection 1 of this section, the minimum prison term which the defendant must serve shall be eighty-five percent of his or her sentence. Any violation of subdivision (4) of subsection 1 of this section is a class B felony.

   3. A person commits the crime of involuntary manslaughter in the second degree if he acts with criminal negligence to cause the death of any person.

   4. Involuntary manslaughter in the second degree is a class D felony.

7. The truth of this analogy is quite apparent in the victim impact statement made by the wife of the victim at Webb's sentencing: She said that she wished that Webb's sentence would run consecutively with the sentence he already was serving because she wanted him to know that he was in prison for her husband's death.

Surely in the United States of America it is fitting to have a market where deals are made, but there can be no respect for a market in which accurate information is not freely available to all participants in the deals, including the public. In the current vogue economic term, our plea-bargain marketplace is not "transparent," and, because of this, the market regularly will fail. This may be tolerable when the commodity being traded is used cars, but when the commodity is justice, the systems' failures should not be tolerated.

To fill this information void in the guilty-plea marketplaces, the United States Supreme Court recently decided *Padilla v. Kentucky,* — U.S. ——, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), which, if its reasoning is followed faithfully, will require that defense attorneys have a professional obligation to inform their clients of the truly clear consequences of their guilty pleas.

*Padilla* puts courts on notice that reciting the usual no-threats-no-promises litany at sentencing does not necessarily ensure that the plea is voluntary. The litany, as referred to in the *per curiam* opinion in this case, is more or less as follows: In response to questions, Webb responded that no one had threatened him or promised him anything to get him to plead guilty; he understood he was waiving all of his rights at trial; he understood the range of punishment available; his attorneys had not made him plead guilty against his free will; his attorneys could not have done anything differently in handling his case; and he was satisfied with their legal services.

*Padilla* held that it is ineffective assistance of counsel for a defense attorney not to advise a defendant about the "truly clear" immigration consequences of his or her plea. *Id.* at 1483. *Padilla* may require us to inquire: If the defendant is not informed of the other inevitable consequences of his plea, how can the plea be considered voluntary? Or, to put it in terms of the sentencing litany, how can Webb be satisfied with his attorney's legal services if he did not know that his attorney misinformed or failed to inform him that he would be required to spend at least 85 percent of his sentence behind bars?

The defendant in *Padilla,* a longtime lawful permanent resident of the United States, pleaded guilty to transportation of a large amount of marijuana. As a result, he was subject to deportation. He alleged that his attorney had not only failed to advise him that he would be deported as a result of his plea, but he also was told "that he 'did not have to worry about immigration status since he had been in the country so long.'" *Id.* at 1478.

The United States Supreme Court noted that the Supreme Court of Kentucky had rejected the defendant's ineffective assistance of counsel claim by holding that potential deportation is a "collateral" consequence. The United States Supreme Court, however, stated that it was not necessary to decide whether the direct-collateral consequences distinction was appropriate because "of the unique nature of deportation." *Id.* at 1481. The Supreme Court noted that because of changes in immigration policy by Congress, if a noncitizen commits a removable offense, "his removal is practically inevitable...." *Id.* at 1480 (emphasis added). The Supreme Court also noted that "deportation is an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizens who plead guilty to specified crimes." *Id.* The Supreme Court further reasoned that deportation is a "particularly severe penalty" and is "intimately related to the criminal process." *Id.* at 1481.

In light of the "practically inevitable" consequence, the Supreme Court considered whether the defendant's trial counsel was ineffective. To find ineffective assistance of counsel under *Strickland v. Washington,* the court is required to "first determine whether counsel's representation 'fell below an objective standard of reasonableness.'" *Padilla,* 130 S.Ct. at 1482 (quoting *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). If it falls below this standard, the court then asks "whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Padilla,* 130 S.Ct. at 1482 (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052).

The Supreme Court stated that counsel's representation is unreasonable if it does not meet "the practice and expectations of the legal community" as outlined by "prevailing professional norms." *Padilla,* 130 S.Ct. at 1482. Failing to advise a client regarding the risk of deportation is unreasonable if that risk is clear from the relevant statutes. *Id.* In reaching that conclusion, the Supreme Court noted that numerous authorities, including the National Legal Aid and Defender Association's (NLADA) Compendium of Standards for Indigent Defense Systems and the ABA Standards for Criminal Justice, require defense attorneys to advise their non-citizen clients as to the risk of deportation. *Id.*

The "prevailing professional norms" of practice language comes from *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052, where the Supreme Court held that such norms should be "guides for determining what was reasonable, but they are only guides." The Supreme Court in *Strickland* emphasized that no particular set of rules for counsel's conduct fully can take into account the decisions that counsel often has to make in representing a criminal defendant. *Id.* at 689, 104 S.Ct. 2052. *Padilla,* however, departs from this reasoning by finding that it is unreasonable for plea counsel not to advise his or her client of "practically inevitable" consequences of the client's guilty plea. *Padilla,* 130 S.Ct. at 1480.

Although a departure from *Strickland,* the *Padilla* analysis follows logically; it is never a reasonable strategy for counsel to depart from prevailing professional norms and fail to advise or misadvise a client of the "practically inevitable" consequences that may result from a guilty plea.

The Supreme Court in *Padilla* further noted that the terms of the relevant immigration statute in the case were "succinct, clear, and explicit in defining the removal consequence for [the defendant's] conviction." *Id.* at 1483. As a result, the defendant's counsel had a responsibility to advise the defendant as to the "truly clear" deportation consequence of his guilty plea. *Id.* The Supreme Court held that under the circumstances of that case the failure to advise the defendant or misadvising him as to his potential deportation was unreasonable. *Id.* at 1483–84.

The Supreme Court declined to limit its analysis to "affirmative misadvice," because such a limit would "invite two absurd results. First, it would give counsel an incentive to remain silent on matters of great importance, even when answers are readily available. Second, it would deny a class of clients least able to represent themselves the most rudimentary advice on deportation even when it is readily available." *Id.* at 1484. The Supreme Court remanded the case to the state court to determine whether the defendant had suffered prejudice. *Id.*

## Does *Padilla* Apply Only to Deportation Consequences?

The scope of the *Padilla* holding on counsel's failure to advise a defendant of the consequences of his plea is not entirely clear. But what is clear is that this Court's prior cases may need to be expanded to take into account the analysis in *Padilla* when considering whether counsel rendered deficient performance. Many state courts and lower federal courts have already considered how *Padilla* applies to consequences beyond deportation, such as parole eligibility.[8]

Deportation and the minimum prison term a defendant is required to serve before becoming eligible for parole have similar characteristics. Deportation is "practically inevitable" for a noncitizen who commits a removable offense. Similarly, if a defendant pleads guilty to certain offenses, such as the class B felony of involuntary manslaughter, he or she is *required* to serve at least 85 percent of his or her sentence. Although a defendant is not guaranteed to receive parole, restrictions on parole eligibility play an integral part in a defendant's decision to enter a guilty plea and impact the plea negotiations. *See Pridham*, 2010 WL 4668961 at *3. There is a substantial difference between becoming eligible for parole in 4.8 years and not becoming eligible for parole until after serving at least 10.2 years, Webb's actual eligibility time under the 85–percent standard.

Parole eligibility and deportation also are similarly consequential in that both are severe results that are intimately related to the criminal process. While perhaps not always as severe as deportation, a defendant's parole eligibility date is the date that he or she first has the possibility of being released from prison under supervision. The defendant's prospect of deportation in *Padilla* was "practically inevit-

---

**8.** The cases from other jurisdictions since *Padilla* include: *Bauder v. Dep't of Corr. State of Florida*, 619 F.3d 1272 (11th Cir.2010) (affirming district court finding of deficient performance of counsel and affirmative misadvice where plea counsel told defendant that he would not be subject to civil commitment, but actually the law was unclear as to whether a possible risk of civil commitment existed); *Wilson v. State*, 244 P.3d 535 (Alaska Ct.App.2010) (finding ineffective assistance where defendant was misinformed that his no contest plea could not be used against him in the expected civil case against him); *Taylor v. State*, 304 Ga.App. 878, 698 S.E.2d 384, 389 (2010) (holding that "failure to advise a client that pleading guilty will require him to register as a sex offender is constitutionally deficient performance"); *Pridham v. Commonwealth*, 2010 WL 4668961 at *3 (Ky.Ct.App. Nov.19, 2010) (concluding that "gross misadvice concerning parole eligibility may amount to ineffective assistance of counsel worthy of post-conviction relief"); *Commonwealth v. Abraham*, 996 A.2d 1090 (Pa.Super.Ct.2010), *appeal granted in part*, 9 A.3d 1133 (Pa. Nov. 30, 2010) (finding ineffective assistance of counsel where plea counsel failed to advise defendant that he would lose his teacher's pension as a result of his guilty plea). *But see Brown v. Goodwin*, slip op., 2010 WL 1930574 (D.N.J. May 11, 2010) (declining to find ineffective assistance of counsel on federal habeas where the state court previously had made the factual finding that the petitioner was adequately informed of the possibility of his civil commitment and also noting, in *dictum*, that civil commitment was not an automatic consequence like deportation); *Maxwell v. Larkins*, 2010 WL 2680333 at *9–10 (E.D.Mo. July 1, 2010) (declining to extend *Padilla* to failure of plea counsel to advise the defendant of the requirement to register as a sex offender, the requirement to complete the Missouri sex offender program (MOSOP) prior to release, and possible commitment under the sexually violent predator (SVP) law, because none of these requirements are mentioned in the NLADA guidelines and sex offender registration is not punitive in that it is only civil and regulatory in nature, the MOSOP program does not resemble deportation, because it is a requirement while in prison to complete parole, and SVP commitment is not an automatic result).

able," but Webb's prospect of serving at least 85 percent of his sentence in prison is a certainty. The Supreme Court in *Padilla* has imposed a requirement on counsel for a serious consequence that is not entirely certain. It is appropriate for this Court to apply the same analysis where a serious consequence—the statutory requirement that means more than twice as long in prison—is certain.

The parole eligibility information in this case is not of the same kind as the information a defendant's attorney may convey to a client about the parole board's *discretionary* guidelines and practices, as set forth in the SARs and available on the website of the Missouri Sentencing Advisory Commission. It may be helpful to counsel and to the defendant to know the parole board's guidelines and practices with regard to particular offenses and categories of offenders. But the decision the parole board makes in such cases—in the absence of a statutory minimum—is discretionary and not subject to post-conviction relief if the board makes a decision that differs from its guidelines or differs from the time that a defendant's attorney may have estimated based upon experience or reviewing the parole board's guidelines.

The question in this case is whether it was unreasonable for Webb's trial counsel to misadvise him about how much time he would be *required* to spend in prison before becoming eligible for parole. In *Padilla,* the Supreme Court examined "the practice and expectations of the legal community" as outlined by "prevailing professional norms." *Padilla,* 130 S.Ct. at 1482. The Supreme Court, as noted, cited several sources, including the National Legal Aid and Defender Association's (NLADA) Compendium of Standards for Indigent Defense Systems and the ABA Standards for Criminal Justice. *Id.* These same sources show that prevailing professional norms require counsel to inform the client about the client's parole eligibility date. The NLADA compendium states that "prior to the entry of the plea, counsel should ... make certain that the client fully and completely understands ... the consequences the accused will be exposed to by entering a plea." 2 Compendium of Standards for Indigent Defense Systems, Standards for Attorney Performance (2000), *available at* http://www.mynlada.org/defender/DOJ/standardsv2/v2h.htm. The NLADA compendium specifically notes that it is important for counsel and client to know of all "parole consequences" while engaged in plea negotiations. *Id.* The NLADA compendium further notes that several states have specific guidelines their defenders are encouraged to follow.[9]

The Missouri state public defender system also has adopted "Guidelines for Representation" that its defenders are required to follow. These guidelines specifically require that "before the Public Defender allows the client to plead guilty, the Public Defender must be satisfied ... [t]hat the client understands the consequences of conviction, including the maximum possible sentence, any mandatory minimum faced by the client, [and] the client's probation and parole eligibility." Missouri State Public Defender, Guidelines for Representation, Guilty Pleas, Prerequisites for Guilty Pleas (November 9, 2001).

---

9. For example, Oregon requires that an attorney should advise his or her client as to "parole or post-supervision eligibility." 2 Compendium of Standards for Indigent Defense Systems, Standards for Attorney Performance (2000), available at http://www. mynlada.org/defender/DOJ/standardsv2/v2h. htm. Massachusetts also specifically requires that clients should be informed of any consequences of their conviction, which relate to parole eligibility. *Id.*

While not as definitive, the ABA standards state that "[t]o the extent possible, defense counsel should determine and advise the defendant, sufficiently in advance of the entry of any plea, as to the possible collateral consequences that might ensue from entry of the contemplated plea." American Bar Association, Criminal Justice Section Standards, Standard 14–3.2(f), *available at* http://www.abanet.org/ crimjust/standards/guiltypleas_blk.html.

The NLADA compendium, the ABA standards and Missouri's own guidelines show that the "prevailing professional norm" in the criminal defense community is for a defendant's counsel to advise the defendant at least as to the statutory minimum sentence before parole eligibility.

In this case, Webb alleged in his post-conviction motion that his plea counsel had told him that as a result of his guilty plea he would not be subject to any "85 [percent] non-parole eligibility rule," but that he would be required to serve 40 percent of his sentence without parole eligibility. Webb alleged that but for his attorney's misrepresentation, he would have rejected pleading guilty and, instead, would have insisted on proceeding to trial. As the *per curiam* opinion discusses, Webb is entitled to relief under *Reynolds v. State,* 994 S.W.2d 944, 946 (Mo. banc 1999), and its progeny.

But under *Padilla,* a criminal defendant also may be entitled to relief even if counsel did not make any definite representation as to parole eligibility where the consequence is "truly clear." *Padilla,* 130 S.Ct. at 1483. *Padilla* says that a holding limited to misadvice only would lead to counsel having an incentive to remain silent as to a serious consequence, even though, as in cases such as this, the attor-

ney can find the correct information easily—by reading the applicable statute. *Id.* at 1484. If a defendant is *required* to serve a minimum amount of prison time by a statute, it would seem to be the attorney's responsibility to inform the client as to this minimum. *Padilla* should be read as limiting the applicability of this Court's holding in *Reynolds,* 994 S.W.2d 944, which held that because parole eligibility is a "collateral" consequence, failure to inform is not ineffective assistance of counsel: When the consequence of the plea is "truly clear," counsel has a duty to inform—not just a duty to avoid misleading the client.

## What Consequences Does *Padilla* Include?

While prevailing professional norms may help discern what a defense attorney should disclose to a client who is to plead guilty to an offense, the consequences can be broad-ranging and scattered throughout the statutes of the state and federal government's. Felony convictions—and in some cases misdemeanor convictions—may disqualify a person from being licensed for various occupations and may be used to deny governmental benefits, access to housing, health care, student loans, and other amenities or necessities those without criminal records may take for granted. "In a real sense, convicted persons are regulated," according to a comment published by the National Conference of Commissioners on Uniform State Laws.[10] "While some disabilities may be well known, such as disenfranchisement and the firearms prohibition, in most jurisdictions, no judge, prosecutor, defense attorney, legislator or agency staffer could identify all of the statutes that would be

---

10. National Conference of Commissioners on Uniform State Laws, Comment to Section 4, *Amendments to Uniform Collateral Conse-* *quences of Convictions Act (2010), available at* http://www.law.upenn.edu/bll/archives/ulc/ ucsada/2010am_draft.pdf.

triggered by conviction of the various offenses in the criminal code." *Id.*

What the courts have done, prior to *Padilla,* is to label all consequences, other than the sentence itself, as "collateral" as a way to remove them from the constitutional protection of the Sixth Amendment right to competent representation. Gabriel J. Chin and Richard W. Holmes, Jr., *Effective Assistance of Counsel and the Consequences of Guilty Pleas,* 67 CORNELL L.REV. 697, 700–701 (2002).

*Padilla* may well limit the courts' ability to disregard some consequences as "collateral" if a particular consequence can be considered "truly clear" and an integral part of the punishment.[11] The question of how a sentencing court ought to inform a defendant of likely consequences of a guilty plea may be appropriate for consideration by this Court's Committee on Procedure in Criminal Cases. Until there is further specific guidance, counsel and the courts should be as vigilant as possible to explain that the guilty plea to which a defendant agrees may carry serious consequences beyond the immediate punishment.

In this case, as in *Padilla,* the defendant who pleaded guilty must show prejudice, that is, that he would not have entered the plea if he had been informed accurately of its consequences. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. And the nature of the relief may be subject to further case law developments.[12]

---

11. Defense counsel also may have an ethical obligation to advise their clients as to these "truly clear" consequences. Although state ethics codes, including Missouri's, "provide only general guidance for attorney behavior" and "do not explicitly address a duty to inform clients" about these consequences, some of their provisions could be interpreted as requiring such warnings. Jenny Roberts, *Ignorance is Effectively Bliss: Collateral Consequences, Silence, and Misinformation in the Guilty–Plea Process,* 95 IOWA L.REV. 119, 153 (2009). The Model Rules of Professional Conduct require lawyers to " 'explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation,' to stay current on the law, and [require] 'legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.' " *Id.* At least one state court, Oregon, has imposed a one-year suspension from the practice of law on a lawyer who, in addition to other disciplinary violations, misadvised his client that his guilty plea would not result in deportation. *Id.* (citing *In re Black,* 21 DISCIPLINARY BD. RPTR. 6, 6–18 (Or.2007)). Oregon's disciplinary code, however, explicitly requires defense counsel to warn clients about the deportation consequences of any guilty plea. *Id.* at 154 n. 146.

The Oregon case appears to be the exception rather than the rule. Roberts at 154 (" 'not one jurisdiction seems actively to use the disciplinary process to protect criminal defendants from incompetent criminal defense representation' ") (quoting Meredith J. Duncan, *The (So–Called) Liability of Criminal Defense Attorneys: A System in Need of Reform,* 2002 BYU L. REV. 1, 43 (2002)). This may be intentional. The American Bar Association previously had "urged jurisdictions to assist defenders in carrying out their 'ethical duty' to advise clients about collateral consequences.' " ABA Policy: Res. 103E Collateral Consequences of Criminal Convictions, Feb. 12, 2007, at 3 n. 4, http://www.americanbar. org/content/dam/aba/migrated/leadership/ 2007/midyear/docs/journal/hundredthreee. authcheckdam.doc. In 2007, however, the ABA noted that although failing to advise as to certain consequences, such as "almost certain deportation in the event of a felony conviction," may be an ethical violation, in many other cases, failure to advise may not be an issue of competency, "particularly where information about those collateral consequences was not readily available." *Id.*

12. The United States Supreme Court may address the question of relief, or the scope of *Padilla,* when it decides the case of *Missouri v. Frye,* in which the Supreme Court recently granted a writ of *certiorari. Frye v. State,* 311 S.W.3d 350 (Mo.App.2010), *cert. granted, Missouri v. Frye,* —— U.S. ——, 131 S.Ct. 856, 178 L.Ed.2d 622 (2011). *Frye* involved a defendant who pleaded guilty to a felony after his

## Conclusion

Decisions requiring that the defendant be informed of the direct consequences of the guilty plea come at an interesting time in the developmental history of our criminal law. There is a duty imposed on defense counsel who might be helped by the report of a probation officer. But these officers—like many public defenders—are overburdened by large caseloads of offenders to be managed on probation and parole and the need to prepare reports to be used at sentencing. While prosecutors have some control in the charging decisions, they too may be overburdened.

Consequences of various kinds may affect as many as one-third of the American public, because about one-third of Americans have criminal records.[13] The public, whose appetite for punishment seems to have increased greatly in recent decades, eventually may realize it is not well served by a criminal justice system whose criminal code is complicated, whose commands reach well beyond the crimes that the common law considered *malum in se* (offenses that are wrong by their very nature—generally those that may be covered by a fair reading of the Ten Commandments) and whose truly clear consequences go well beyond probation, prison and parole. These observations raise questions that properly are for the General Assembly.

In the meantime, judges, prosecutors, defense attorneys, probation officers and the department of corrections will soldier on, trying to patch together a system that is worthy of the word "justice."

That said, I concur in the *per curiam* opinion.

ZEL M. FISCHER, Judge, dissenting.

I respectfully dissent from the *per curiam* opinion because, in my view, the record clearly refutes Webb's claim. Nothing in the record shows that the motion court's overruling of Webb's Rule 24.035 motion was clearly erroneous. Rule 24.035(k); *Feldhaus v. State*, 311 S.W.3d 802, 804 (Mo. banc 2010). I also think the concurring opinion may overread the holding of *Padilla v. Kentucky*, —— U.S. ——, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010).[1] It suggests that the analysis of *Padilla*, which departed significantly from the well-settled law that defense counsel satisfied his constitutional duty when he informed the defendant of the direct consequences of his guilty plea but not necessarily the collateral consequences of his plea, may be expanded to collateral consequences in addition to deportation. In my view, the analysis of *Padilla* would not apply to the collateral consequence of parole eligibility.

### Webb's Claim is Refuted by the Record

Webb argues that if his counsel had told him that he would have to serve 85% of his

---

attorney failed to inform him of a misdemeanor plea offer. In the grant of *certiorari,* the Supreme Court asked the parties to brief this question: "What remedy, if any, should be provided for ineffective assistance of counsel during plea bargain negotiations if the defendant was later convicted and sentenced pursuant to constitutionally adequate procedures?"

**13.** U.S. Dept. of Justice, Bureau of Justice Statistics, *Survey of State Criminal History Information Systems, 2008* 3 (2009) ("Over 92

million individual offenders were in the criminal history repositories of State criminal history repositories on December 31, 2008," though individuals may have records in more than one state), *available at* http://www.ncjrs.gov/pdffilesl/bjs/grants/228661.pdf.

**1.** The *per curiam* opinion states "[i]t is not necessary to consider whether *Padilla* applies to other consequences such as parole eligibility, because Webb is entitled to an evidentiary hearing under Missouri's case law." Op. at 131 n. 8.

sentence before becoming eligible for parole, he would not have pleaded guilty.[2] He claims that he was prejudiced by his counsel's misinformation because if he had known he would have to serve 85% of his sentence before becoming eligible for parole, he would have gone to trial.

At the plea hearing, the following exchanged occurred:

> Court: Has anyone threatened you to get you to plead guilty?
>
> Webb: No.
>
> Court: Has anyone promised you anything other than the State's recommendation to get you to plead guilty?
>
> Webb: No.

Later at the hearing, the following also was said:

> Court: Did [your attorney] make you plead guilty against your free will?
>
> Webb: No.
>
> Court: Can you think of anything at all that they should have done differently in handling your case?
>
> Webb: No.
>
> Court: Are you completely satisfied with their legal services?
>
> Webb: Yes.

After consideration of pleadings and the record, the motion court made findings of fact and conclusions of law that included the following:

> The record of the plea hearing conclusively refutes Movant's allegation that his attorney promised that he would not have to serve 85% of his sentence. Early into Movant's plea hearing, the Court asked Movant, "Has anyone promised you anything other than the State's recommendation to get you to plead guilty?" To which Movant replied, "No." Movant acknowledged that he was aware of his various trial rights and the consequences of a guilty plea upon those rights.

\*     \*     \*

At no time during the entire hearing did Movant state that he felt compelled or coerced to plead guilty due to any promises regarding a certain percentage of his sentence that would have to be served before parole eligibility. "The defendant has no right to parole and may never receive parole." *Torrence [v. State*, 861 S.W.2d 149, 150 (Mo.App. 1993) ]. Rather, Movant stated affirmatively that no promises were made to him whatsoever other than the State's recommendation.

Counsel only has an obligation to inform a defendant of the direct consequences of his guilty plea and has no duty to inform the defendant of collateral consequences of pleading guilty and accordingly, counsel's failure to advise defendant regarding collateral consequences of guilty plea cannot rise to level of constitutionally ineffective assistance of counsel; examples of collateral consequences of guilty plea include parole eligibility, right of crime victim or family of victim to be heard at sentencing, deportation proceedings, and sentencing after probation revocation. *U.S.C.A. Const. Amend. 6. Brown v. State*, 67 S.W.3d 708, 710 [ (Mo.App. 2002) ].

\*     \*     \*

The trial court and counsel have a duty to inform the defendant of the "direct" consequences of pleading guilty, but not the "collateral" consequences. *State v. Hasnan*, 806 S.W.2d 54, 55 [ (Mo.App.1991) ]. Direct consequences "are those which definitely, immediately, and largely automatically follow the en-

---

**2.** I agree this information should be included in the sentencing assessment report.

try of a plea of guilty." *Id.* at 56, quoting *Huffman v. State,* 703 S.W.2d 566, 568 (Mo.App.1986). The question is whether movant had the knowledge and understanding of the consequences of his plea. *State v. Bursby,* 395 S.W.2d 155, 159 (Mo.1965).

"The rules are silent about the judge advising [movant] concerning application of parole, conditions of parole, length of time to be served before eligibility for parole, etc." *State v. Rice,* 887 S.W.2d 425, 427 (Mo.App.1994); Rule 24.02(b). Parole is a "collateral" consequence. *Id.*

"[C]ounsel has no duty to inform a defendant of all the collateral consequences of his guilty plea." *Schofield v. State,* 750 S.W.2d 463, 465 (Mo.App. 1988). Failure of counsel to inform movant of all the collateral consequences of his guilty plea is an insufficient basis for an ineffective assistance claim. *Clark v. State,* 736 S.W.2d 483, 484 (Mo. App.1987). Improper advice or a lack of advice regarding collateral consequences, such as parole eligibility, does not automatically undermine the voluntariness of the guilty plea. *White v. State,* 957 S.W.2d 805, 808 (Mo.App. 1997); *Torrence v. State,* 861 S.W.2d [149,] 150 (Mo.App.1993).

Movant was informed of the direct consequences of his guilty plea. Prior to entering his guilty plea, the Court advised defendant of the mandatory minimum penalty provided by law and the maximum possible penalty provided by law. He waived his right to a trial as well as his right not to be compelled to incriminate himself when he entered a plea of guilty.

As stated previously, to justify an evidentiary hearing, "the facts alleged [in Movant's Motion] must raise matters not refuted by the files and records in the case." [*State v.*] *Brooks* [960 S.W.2d 479, 497 (Mo. banc 1997) ]. Movant's Motion fails to meet this burden because Movant's own statements made during his plea hearing conclusively refute his claim that his attorney told him he would not have to serve 85% of any sentence imposed. To the contrary, Movant clearly and unequivocally stated that he was promised nothing except that which was contained in the recommendation from the State. Movant has not alleged facts unrefuted by the files and records in the case, as is required by *Brooks,* 960 S.W.2d at 497. (Motion court's citations to the record omitted.)

At no point in the record did Webb state that his plea was based on a statement by defense counsel that he would only serve 40% of his sentence before becoming eligible for parole. Rather, Webb states that no promises were made to him, other than the State's plea agreement, in return for his plea. The plea agreement was that the State would recommend a 10–year sentence on the manslaughter charge, a 10–year sentence on the armed criminal action charge, and that the sentences would run concurrently. The motion court's determination that Webb's claim is clearly refuted by the record is not clearly erroneous.

Pursuant to our Rule 24.02(b)(1), the sentencing court accepting the guilty plea must advise the defendant of the "mandatory minimum penalty provided by law." The term " 'mandatory minimum penalty' does not refer to parole eligibility, but refers instead to the low end of the range of punishment for the offense proper." *Reynolds v. State,* 994 S.W.2d 944, 947 (Mo. banc 1999).

In this case, the sentencing court followed the protocol of our Rule 24.02(4)(c) ensuring that the plea was voluntary by "inquir[ing] as to whether the defendant's willingness to plead guilty results from prior discussions between the prosecuting

attorney and the defendant or defendant's attorney." Additionally, using the exact words of that rule, the sentencing court addressed Webb in open court to determine that no "threats or promises apart from the plea agreement" had been made before the court accepted the plea and determined that the plea of guilty was voluntarily made.

The *per curiam* opinion holds that Webb's assertion of his attorney misadvising him as to his parole eligibility is not clearly refuted by the record because no question was asked to him specifically regarding his parole eligibility. Op. at 130. In so holding, the per curiam opinion relies on two court of appeals cases: *Shackleford v. State,* 51 S.W.3d 125 (Mo.App.2001), and *Reid v. State,* 192 S.W.3d 727 (Mo.App. 2006). However, the *per curiam* opinion ignores this Court's decision in *Peiffer v. State,* 88 S.W.3d 439 (Mo. banc 2002), which, unlike *Shackleford* and *Reid,* is authoritative.

In *Peiffer,* the defendant argued that he had received ineffective assistance of counsel because his counsel "told him that if he pleaded guilty and received concurrent sentences, his date for earlier release on another sentence would not be affected." 88 S.W.3d at 445. He asserted that if his attorney had not given him this misinformation he would not have pleaded guilty. *Id.* In considering this argument, this Court reviewed Peiffer's testimony at the plea hearing, which was as follows:

> Peiffer testified that he understood the range for each stealing count to be one day in jail to seven years in the penitentiary, possibly accompanied by a fine of no more than $5,000. When asked whether any promises were made other than that he would receive concurrent sentences for the four guilty pleas entered that day for his four different stealing charges, he said no. Peiffer

also affirmatively answered that his attorney had fully advised him of all the legal aspects of his cases, including his rights and the possible consequences of entering guilty pleas.

*Id.* at 446. Based on this record, this Court determined that "Peiffer failed to establish any facts not refuted by the record; therefore, he was not entitled to a hearing." *Id.*

The record presented in this case is similar to that in *Peiffer;* therefore, I would find that Webb has failed to establish any facts not refuted by the record. To do otherwise and require, as the *per curiam* opinion does, that a fact is only refuted upon a question narrowly asked regarding that particular fact would place the finality of guilty pleas on a slippery slope. This result will either lead to the trial court having to ask innumerable questions to inquire about every piece of advice given by defendant's counsel or allow a defendant countless grounds to challenge his conviction based on a plea for which he already received a benefit. If Webb was sincerely relying on a belief that he would be eligible for parole after serving 40% of his sentence, then the general question he was asked was sufficient to have elicited that response.

### Analysis of *Padilla*

I agree with the concurring opinion that "[t]he scope of the *Padilla* holding on counsel's failure to advise a defendant of the consequences of his plea is not entirely clear." Op. at 136. I agree that the concurring opinion applies similar analysis as applied by the United States Supreme Court in *Padilla* in that the Court emphasized that plea counsel renders deficient performance where counsel misinforms his client as to a 'practically inevitable' consequence of his guilty plea. However, unlike the concurring opinion, I do not anticipate

that the analysis of *Padilla* will be expanded by the United States Supreme Court beyond the deportation context. The holding in *Padilla* may be limited to apply only to its particular facts.

There has not been uniformity in the expansion of *Padilla* beyond deportation cases. "[T]he holding of *Padilla* seems not importable—either entirely or, at the very least, not readily importable—into scenarios involving collateral consequences other than deportation." *Brown v. Goodwin*, 2010 WL 1930574 at *13, (D.N.J. May 11, 2010) (declining to apply *Padilla* to a claim that counsel failed to inform the defendant that his guilty plea would place him at risk of civil commitment as a sexually violent predator); *see also Maxwell v. Larkins*, 2010 WL 2680333 at *8–10 (E.D.Mo. July 1, 2010) (declining to expand *Padilla* to find defense counsel ineffective for failing to advise the defendant of the possibility of commitment as a sexually violent predator, sex offender registry, or completion of the MOSOP program).

The actual holding of *Padilla* is that defense counsel has an affirmative duty to advise the defendant when the terms of an immigration statute are clear and explicit that a conviction will require deportation and an affirmative duty to advise that a conviction may carry a risk of deportation when the immigration statute is not clear and explicit that a conviction will require deportation.[3] *Padilla*, 130 S.Ct. at 1483–84.

The most serious and consequential issue raised in the concurring opinion is whether it is necessary for defense counsel or the sentencing court to advise a defen-

dant of the implications of the 85% rule affecting parole eligibility in § 558.019.3, RSMo Supp.2007, in order for his plea to be made knowingly, voluntarily, and intelligently.[4] This issue is not a matter of first impression, and, predictably, parole eligibility has been held to be a collateral consequence; therefore, the sentencing court and counsel have no duty to inform the defendant of this collateral consequence of the plea of guilty. *Reynolds v. State*, 994 S.W.2d 944, 946 (Mo. banc 1999); *Drone v. State*, 973 S.W.2d 897, 902 (Mo.App.1998). The duty of defense counsel, as explained in these cases, is to advise of the direct consequences of the plea of guilty. *Reynolds*, 994 S.W.2d at 946; *Drone*, 973 S.W.2d at 902; Rule 24.02(b).

These cases relied on the United States Supreme Court's pronouncement in *Hill v. Lockhart* that "[w]e have never held that the United States Constitution requires the State to furnish a defendant with information about parole eligibility in order for the defendant's plea of guilty to be voluntary...." 474 U.S. 52, 56, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). This is the last word from the United States Supreme Court on this issue.

The *Padilla* decision marked "a major upheaval in the Sixth Amendment law." *Padilla*, 130 S.Ct. at 1491 (Alito concurring). *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), decided that the constitutional right to effective assistance of counsel applied to guilty pleas, but some 26 years later, *Padilla* does not cite a single case from the United States Supreme Court or any other federal court that holds that defense coun-

---

3. Is there such a disconnect between the sentence imposed and the sentence actually served that defense counsel and/or the court now have an affirmative duty to advise the defendant that his plea of guilty "may carry a risk of actually serving his sentence?"

4. The fact is that advising the defendant of when he *may* first be eligible for parole may be more harmful than helpful in the context of whether his plea of guilty is voluntary because it may create a false expectation that he *will* be paroled at the first opportunity.

sel's failure to provide advice regarding deportation consequences of a criminal conviction violated a defendant's Sixth Amendment right. 130 S.Ct. at 1491.

The majority opinion in *Padilla* appropriately acknowledges that the lower courts are now quite experienced with applying *Strickland* but "casually dismisses the longstanding and unanimous position of the lower federal courts with respect to the scope of criminal defense counsel's duty to advise on collateral consequences." *Id.* at 1492.[5]

Deportation is a serious consequence of a guilty plea; not being eligible for parole until serving 85% of a sentence is a serious consequence of a guilty plea. But a criminal conviction resulting from a guilty plea can carry a wide variety of "truly clear" consequences other than conviction and sentence including civil commitment, disqualification from public office, civil forfeiture, sex offender registry, the loss of the right to vote, disqualification from public benefits, ineligibility to possess firearms, dishonorable discharge from the Armed Forces, and loss of business and professional licenses. All, some, or none of these consequences could be extensions of the *Padilla* decision. The departure from the predictability of distinction between direct consequences and collateral consequences could be so unpredictable and unworkable that *Padilla* may not be extended to collateral consequences other than deportation.

## Conclusion

While I disagree with the *per curiam* opinion, I do find some comfort in the fact that Webb and other defendants who have admitted they are guilty as charged but yet seek to set aside their guilty plea relying on the holding of the *per curiam* opinion will lose the benefit of their bargain obtained as a result of their plea and ultimately may receive a less favorable outcome.[6] If Webb is successful on remand in convincing the motion court he was affirmatively misinformed as to his parole eligibility and that if he had been correctly advised as to his parole eligibility, he would have gone to trial, he would be entitled to relief under the cases cited by the *per curiam* opinion. In addition to the possibility that Webb could be sentenced as a persistent offender on remand, he certainly risks a 15–year sentence for the involuntary manslaughter charge and a life sentence for the armed criminal action charge, plus the possibility that the sentencing court could run these sentences consecutively as opposed to concurrently. *See* § 565.024, RSMo Supp.2007; § 558.011.1(2), RSMo Supp.2007; § 571.015, RSMo 2000.

For the foregoing reasons, I respectfully dissent from the *per curiam* opinion and would affirm the motion court's judgment.

5. This is the law in virtually all jurisdictions including 11 federal circuits, 30 states, and the District of Columbia. *Padilla*, 130 S.Ct. at 1487 (Alito concurring).

6. In this case, Webb was given the opportunity to withdraw his guilty pleas when the sentencing court, which after review of the sentencing assessment report, indicated it would not agree to the two 10-year concurrent sentences pursuant to the plea agreement, but rather was going to enter two 12-year concurrent sentences. Webb voluntarily chose not to withdraw his guilty plea.